FILED

2012 SEP 24  PM 3: 35

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  MARK BUTLER & ASSOCIATES
   Mark J. Butler, Bar No. 207909
2  mark.butler@mbutler-law.com
   1103 Quail Street
3  Newport Beach, California 92660
   Telephone: (949) 756-8970; Facsimile: (949) 743-2938
4

5  LAW OFFICES OF MICHAEL J. BULEY
   Michael J. Buley, Bar No. 164249
6  mjbuley@buleylaw.com
   1103 Quail Street
7  Newport Beach, California 92660
   Telephone: (949) 752-1161; Facsimile: (949) 752-1195
8

9  Attorneys for Plaintiffs and the Plaintiff Class

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12

13  JUAN COMPARETTO, an individual; LORI      ) Case No.: LA CV 11-9206 JAK (FFMx)
    ABDELNOUR, an individual; MANUEL          )
14  ARAGON, an individual; JOSEPH COLLIER, an )
    individual; ROBERT JOHNSTON, an individual; ) CLASS-ACTION
15  GILBERT LEMUS, an individual; MICHAEL     )
    ROMERO, an individual; RALEIGH STRADER,   )
16  an individual; JAMES WEBB, an individual;  ) THIRD AMENDED COMPLAINT FOR:
17  PAUL SCHEIFEN, an individual;             )
    BROWNWOOD INSURANCE AGENCY, INC.,         ) 1) BREACH OF THE IMPLIED
18  a corporation; ARTURO AVILA, an individual; ) COVENANT OF GOOD FAITH AND FAIR
    ART AVILA INSURANCE AGENCY, INC., a       ) DEALING;
19  California corporation; BESHERET          )
20  ENTERPRISES, INC., a California corporation, ) 2) BREACH OF WRITTEN CONTRACT;
    dba TONY PAOLETTA INSURANCE AGENCY;)  AND
21  ANTONIO PAOLETTA, an individual; BILLY J. )
    TAYLOR INSURANCE AGENCY, INC., a          ) 3) VIOLATION OF BUSINESS &
22  corporation; BILLY TAYLOR, an individual;  ) PROFESSION CODE § 17200 et seq.
23  MUNSELL  INSURANCE AGENCY, INC., a        )
    California corporation; DELORES JANE       )
24  MUNSELL, an individual,                   ) [INJUNCTIVE RELIEF REQUESTED]
                          Plaintiffs,         )
25          vs.                               ) JURY TRIAL DEMANDED
26                                            )
    ALLSTATE INSURANCE COMPANY, an           )
27  Illinois corporation; and DOES 1 - 10 inclusive )
                                              )
28  _____       )
                          Defendants.         )

                                    1

Plaintiffs allege:

## PARTIES TO THE ACTION

1.     Plaintiff Juan Comparetto("Comparetto") is and at all times relevant to this Action was an individual working as an Allstate agent and doing business as Juan Comparetto Insurance Agency in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

2.     Plaintiff Lori Abdelnour ("Abdelnour") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

3.     Plaintiff Manuel Aragon ("Aragon") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

4.     Plaintiff Arturo Avila ("Avila") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

5.     Plaintiff Joseph Collier ("Collier") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

6.     Plaintiff Robert Johnston ("Johnston") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

7.     Plaintiff Gilbert Lemus ("Lemus") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

8.     Plaintiff Michael Romero ("Romero") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this  Action being filed on September 1, 2011.

9. Plaintiff Antonio Paoletta ("Paoletta") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

10. Plaintiff Raleigh Strader ("Strader") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

11. Plaintiff Billy Taylor ("Taylor") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

12. Plaintiff James Webb ("Webb") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

13. Plaintiff Paul Schiefen ("Schiefen") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

14. Plaintiff Brownwood Insurance Agency, Inc. ("Brownwood Inc.") at all times relevant to this Action, is or was (a) a business entity with its principal place of business in California, and (b) authorized to transact and did transact business in the State of California.

15. Plaintiff Delores Jane Munsell ("Munsell") is and at all times relevant to this Action was an individual working as an Allstate agent in the State of California within the last four (4) years prior to the date of this Action being filed on September 1, 2011.

16. Plaintiff Art Avila Insurance Agency, Inc. ("Avila Inc."), at all times relevant to this Action, is or was (a) a business entity with its principal place of business in California, and (b) authorized to transact and did transact business in the State of California.

17. Plaintiff Besheret Enterprises, Inc. dba Tony Paoletta Insurance Agency ("Besheret Inc.") at all times relevant to this Action, is or was (a) a business entity with its principal place of business in California, and (b) authorized to transact and did transact business in the State of California.

3

18.     Plaintiff Billy J. Taylor Insurance Agency, Inc. ("Taylor, Inc.") at all times relevant to this Action, is or was (a) a business entity with its principal place of business in California, and (b) authorized to transact and did transact business in the State of California.

19.     Plaintiff Munsell Insurance Agency, Inc. ("Munsell, Inc.") at all times relevant to this Action, is or was (a) a business entity with its principal place of business in California, and (b) authorized to transact and did transact business in the State of California.

## DEFENDANT

20.     Plaintiffs are informed and believe and on that basis allege that Defendant ALLSTATE INSURANCE COMPANY, an Illinois corporation ("ALLSTATE") is, and at all times relevant to this Third Amended Complaint ("TAC"), the Second Amended Complaint, the First Amended Complaint, and the original Complaint was, a corporation organized and existing under the laws of the State of Illinois with its principal place of business located in Northbrook, Illinois.  Plaintiffs are further informed and believe and on that basis allege that ALLSTATE does, and at all times relevant to this Complaint did, transact business in the State of California, County of Los Angeles, and that some of the tortious, unlawful, unfair, fraudulent, deceptive, untrue, and misleading conduct that this Defendant engaged in, as alleged in this Complaint, occurred in Los Angeles County and/or the damages from that misconduct occurred in or arose from Los Angeles County. Furthermore, on December 1, 2011, counsel of record for Defendant ALLSTATE, Gary McLaughlin of Akin Gump Strauss Hauer & Feld, LLP, executed a written stipulation in this Action that was filed with the United States District Court for the Central District of California, including stipulating to the fact that: "defendant Allstate Insurance Company, an Illinois corporation, is the entity in privity with, and a party to the contract between it and, the Plaintiffs and the purported Plaintiff Class in regard to their status as current or former California Allstate Agency Owners."

## DOE DEFENDANTS

21.     The true names and capacities of the Defendants, DOES 1 through 10, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by such fictitious names and will ask leave of Court to amend this Complaint to show their true names or capacities when the same have been

4

1  ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the DOE Defendants

2  is, in some manner, responsible for the events and happenings herein set forth and proximately caused

3  injury and damages to the Plaintiffs as herein alleged.

4     22.     Plaintiffs are informed and believe and on that basis allege that at all times herein

5  mentioned, DOE DEFENDANTS 1-10 were the agents and/or joint tortfeasors of defendant

6  ALLSTATE, and in doing the things mentioned herein were acting within the scope of such agency

7  and/or joint actions.

8                          **JURISDICTION AND VENUE**

9     23.     The Court may properly exercise personal jurisdiction over ALLSTATE because

10  ALLSTATE has engaged and continues to engage in substantial, continuous and systematic activities

11  within California and exercising personal jurisdiction would be fair and reasonable under the

12  circumstances.  ALLSTATE, at all relevant times, has conducted and continues to conduct substantial

13  business throughout the State of California.

14     24.     Venue is proper in the United States District Court for the Central District of California

15  because this action was originally brought in the Los Angeles Superior Court for the State of

16  California, and was removed to the United States District Court for the Central District of California

17  by defendant ALLSTATE, therefore venue is proper under 28 U.S.C. § 1441(a).  In addition, many of

18  Defendant ALLSTATE's wrongful acts as alleged by Plaintiffs to support their claims in this action

19  were physically undertaken in Los Angeles County which is within the geographic boundary of the

20  United States District Court for the Central District of California.

21                          **CHOICE OF LAW**

22     25.  The Court properly can and should apply California law to all of the claims and issues

23  asserted herein. Federal courts in diversity actions are required to apply state law on all substantive

24  issues (*Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64, 78-79) California is the state in which all of

25  the Plaintiffs conducted their insurance business/practice as Allstate Insurance Agency Owners, and

26  the state in which the misconduct alleged herein as to all class members emanated.  Moreover, at all

27  times relevant to the facts alleged and claims asserted in this Action, Defendant ALLSTATE has

28  continually conducted business throughout California.  Accordingly, California has a connection to the

THIRD AMENDED COMPLAINT

claims of Plaintiffs and each class member, and no state has a greater interest than California in having its law apply to this case. It is well settled that "a forum state may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a 'significant contact or significant aggregation of contacts' to the claims of each class member such that application of the forum law is 'not arbitrary or unfair.'" (*Washington Mutual Bank, FA v. Superior Court* (2001) 24 Cal.4th 906, 919 (quoting *Phillips Petroleum Company v. Shutts* (1985) 472 U.S. 797, 821-22.) Further, there is no federal question at issue and the causes of action and remedies relating thereto are based solely on California statutes and California common law.

## BRIEF FACTUAL BACKGROUND

26.    In the late 1990s, ALLSTATE, or its predecessor(s) in interest, decided to convert its California based insurance agents from employees to independent contractors operating as independent insurance agencies that owned their own independent businesses.

27.    In convincing Plaintiffs and the Plaintiff Class on agreeing to operate as independent contractors instead of employees, starting on or about 1996 and continually thereafter to the present day, in leading up to, at execution of, and after the parties entered into, the written Exclusive Agency Agreement, ALLSTATE, or its predecessor(s) in interest, specifically and repeatedly informed the Plaintiffs and Plaintiff Class (sometimes collectively referred to herein as the "Allstate Agency Owners"): that the key benefit to being an independent contractor/owner of their own Allstate insurance agency as opposed to an Allstate employee was that as an Allstate Agency Owner each person would own their own business, that they would each run their business as they saw fit, that they could each build equity in their business (i.e. their self-owned agency), that if/when they decide to sell their insurance agency/business, they could do so in a fair and open market and thus reap the benefits of being a successful small business owner; that the 90 day termination provision contained in the written Exclusive Agency Agreement would only be used to terminate agency owners that were determined to have engaged in illegal, unethical, or other explicitly wrongful conduct; and that the provision contained in the written Exclusive Agency Agreement regarding approval by ALLSTATE of potential buyers of an Allstate Agency Owner's business would only be used by ALLSTATE in good

THIRD AMENDED COMPLAINT

faith to reject potential buyers that did not meet minimum levels of achievement.  These were the lynchpins of the Exclusive Agency Agreement.  The Allstate Agency Owners were told repeatedly by ALLSTATE that owning their own independent agency and building equity in their book of business through hard work and internal growth, purchase, or some combination of both, was much better than, and in lieu of, any pension or retirement benefits they would have as an employee of ALLSTATE or any other insurance company because the Allstate Agency Owners could keep their business for as long as they wished or cash out at their own time of choosing and sell their businesses for a fair price on a fair and open market and use the proceeds of the sale to fund their retirement.  The sale being to an objectively qualified third-party subject to the approval of ALLSTATE, said approval not to be withheld absent an honest, good faith determination of the buyers legitimate qualifications.

28.    The original agreement between ALLSTATE and Plaintiffs Aragon, Collier, Comparetto, Lemus, Romero, Strader, and Webb consisted of an R3001 Exclusive Agency Agreement ("R3001") which incorporated through reference a Supplement ("Supplement") and an Exclusive Agency Independent Contractor Manual ("Manual"). (True and correct copies of these documents are attached hereto and made a part hereof as Exhibits A , B and C respectively).

29.    Plaintiffs Abdelnour, Avila, Johnson, Munsell, Paoletta, Schiefen, and Taylor's R3001C Exclusive Agency Agreement ("R3001C") with ALLSTATE incorporated through reference an additional document entitled Allstate Agency Standards ("Standards"). (A true and correct copy of the Standard document is attached hereto and made a part hereof by this reference as Exhibits D).  (A true and correct copy of the R3001C Agreement is attached hereto as Exhibit E and made a part hereof by this reference).[1]

30.    The R3001 between ALLSTATE and Plaintiffs Abdelnour, Aragon, Collier, Comparetto, Lemus, Romero, Strader, and Webb contained the following express language at paragraph I.B. "You are an Independent contractor for all purposes and not an employee of the Company.  You will have full control of your time and the right to exercise independent judgment as

---

[1] The R3001 Agreement referenced in paragraph 28 and the R3001C Agreement referenced in paragraph 29 are essentially the same and are generally referred to throughout this TAC as the "Agreement".

7

1    to the time, place, and manner of performing your duties under this Agreement."

2        31.    The R3001C between ALLSTATE and Plaintiffs Avila, Johnson, Munsell, Paoletta,

3    Schiefen, and Taylor contained the following express language at paragraph I.D. "The relationship

4    between the Company and the Agency... will be that of an independent contractor for all purposes."

5        32.    Paragraph III.A in all versions of the Agreement (Exhibits A and E respectively) reads:

6    "You have no authority to employ persons on behalf of the Company, and no employee of yours will

7    be deemed to be an employee or agent of the Company, such employees at all times remaining your

8    employees.  You have sole and exclusive control over your labor and employee relations policies, and

9    your policies relating to wages, hours, and working conditions of your employees.  You have the sole

10   and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge

11   your employees."

12       33.    The original Manual at the time of contracting contained the following language

13   acknowledging Plaintiff's ownership interest in the income derived from their books of business and

14   their right to sell that interest: "Transfer of Interest/Sale of Agency- You will have an economic

15   interest in your Allstate customer accounts developed under the R3000 and R3001 Agreements.  The

16   Company owns your book of business.  You may transfer your economic interest upon termination of

17   your relationship with Allstate by either: 1. Selling the economic interest in the business to a qualified

18   buyer, or 2. Exercising your rights under the Termination Payment provision of the R3001

19   Agreement." (Exhibit C, underline added)

20       34.    The Manual was unilaterally changed by ALLSTATE in bad faith and contrary to the

21   reasonable expectations of the parties at the time of contracting such that as of 2010 the above

22   provision was changed to state: "Sale of Agency- Subject to the terms and conditions set forth in the

23   R3001 Agreement, the Supplement, and this Manual, you may transfer your economic interest in the

24   business written under the R3000 and/or R3001 Agreements upon the termination of your agency

25   relationship with Allstate by either: 1. Selling your economic interest in the business to an approved

26   buyer, or 2. Electing the termination payment." (underline added)

27       35.    At the time of the conversion from an employee based insurance agency system to an

28   independent contractor based insurance agency system, and continually thereafter, ALLSTATE

8

required (and still requires) all of the Allstate Agency Owners to execute a non-negotiable, standardized written Agreement on a take-it-or-leave-it basis.  Since ALLSTATE first imposed the Agreement on the Allstate Agency Owners, ALLSTATE has, from time to time, amended the Supplement and Manual. All of the written amendments to the Supplements and Manual were drafted exclusively by ALLSTATE and none of which were subject to negotiation between ALLSTATE and the Allstate Agency Owners.

36.    Allstate Agency Owners were required by ALLSTATE to sign the Agreement, prepared solely by ALLSTATE as a condition of continuing to earn commissions from the customers whom the Allstate Agency Owners had caused to purchase ALLSTATE products.

37.    At the time of contracting between ALLSTATE and the Allstate Agency Owners, there existed, and still exists, oppression and/or surprise due to unequal bargaining power in that ALLSTATE asserts ownership of the policies issued to customers for which the Allstate Agency Owners were earning salaries or otherwise entitled to commission, and ALLSTATE presented the Agreement, and subsequent amendments, on a take-it-or-leave-it basis.  The Allstate Agency Owners were, and continue to be, faced with, executing the Agreement "as is" without any input, negotiation, or bargained-for modifications, or walking away from their business/insurance agency.

38.    Within the last four years, ALLSTATE's application of the terms of the Agreement has had the effect of creating overly harsh or one-sided results which have frustrated the purpose and intent of the Agreement.  Specifically, the overly harsh or one-sided results include, but are not limited to, ALLSTATE taking actions designed to force the Allstate Agency Owners into a position where they were compelled to transfer and/or sell their businesses at values substantially below true market either to ALLSTATE or to a third-party subject to ALLSTATE's bad faith approval/rejection process by which ALLSTATE unilaterally refused to consider and/or approve many extremely well qualified potential buyers, thus eliminating any actual bargaining power and therefore reducing the value of the Allstate Agency Owners economic interest in their book of business.

39.    The Agreement, drafted by ALLSTATE, contains a provision giving ALLSTATE exclusive judgment to approve or disapprove potential buyers proposed by Allstate Agency Owners, but it does not give ALLSTATE the right to refrain from fairly considering all potential buyers, and

9

ALLSTATE was, in fact, legally required to consider, in good faith, the qualifications of each proposed buyer on his or her own merits and then exercise its discretion in good faith when deciding whether to accept or reject any buyer.

40.    ALLSTATE was required to exercise this exclusive judgment in good faith and Plaintiffs are informed and believe that ALLSTATE failed to do so based, in part, on the following facts:

a.    Hank Barge, the highest ranking ALLSTATE executive officer overseeing ALLSTATE operations in California made public statements at various ALLSTATE California functions within four years prior to the date that this Action was filed on September 1, 2011 that ALLSTATE would be reducing the number of agencies in California by 30% to 60% (or more) and he told a large group of Agency Owners at an official ALLSTATE California Agent meeting that "50% of you will be gone." These statements by Barge were made on or about the same time that ALLSTATE began implementation of a policy of not considering at all, or not considering in good faith, potential buyers for California based Allstate Agencies.

b.    Upon information and belief, ALLSTATE's decision to reduce the number of Allstate Agency Owners was initially driven by a scheme to deprive the targeted California Agency Owners' equity in their books of business by retaining for itself all of the renewal commissions on those books of business by failing to consider and/or failing to use good faith in exercising its exclusive judgment to approve or disapprove of prospective buyers and instead transferring ("parking") those books of business to a call center owned and operated by ALLSTATE.

c.    Upon information and belief, after ALLSTATE's scheme to transfer books of business to its call center was a miserable failure that resulted in extremely low renewal rates due to customers whose accounts were transferred to the call center choosing not to renew their policies, ALLSTATE modified its scheme to deprive the California Agency Owners of their equity in their economic interest in their respective books of business by failing to consider and/or to use good faith in exercising its exclusive judgment to approve or disapprove of prospective buyers and instead favoring pre-approved buyers handpicked or recruited by ALLSTATE, thus driving down the value of the Agency Owners books of business, and

10

reducing the amount of financing necessary for its hand-picked buyers to purchase the devalued books of business so that when ALLSTATE enacts its modified scheme to reduce (and thus recapture for itself) the renewal commissions paid on the books of business (originally set to be reduced as of the beginning of 2012 from the current 10% renewal commission to 8% renewal commission, but now set to be reduced in 2013 from the current 10% renewal commission to 9% renewal commission) the new Agency Owners that purchased the books of business at the substantially under-market values will have lower financing/capital costs and therefore be able to swallow the renewal commission reductions without going out of business, all to the benefit of ALLSTATE

d.      Upon information and belief, in order to facilitate the devaluation of the Agency Owner's economic interests in their respective books of business to further its scheme, ALLSTATE also coached its hand-picked buyers not to pay more than incrementally above the termination payment for a book of business since there would be no other approved buyers to compete for the purchase of an agency, which was completely consistent with Hank Barge's statement to the Agency Owners that he would not pay more than a 2.0 multiple for a book ( prior to ALLSTATE'S misconduct as herein alleged, the prevailing multiple was 4.0 – 4.5).

41.      ALLSTATE's failure to use good faith in exercising its exclusive judgment to approve or disapprove potential buyers and/or its refusal to consider potential buyers within the four years prior to this Action being filed on September 1, 2011, as described herein, has directly harmed all of the California based Allstate Agency Owners' (i.e. all of the named Plaintiffs and the proposed Plaintiffs' Class) by decimating the market for, and thereby significantly reducing the value of, each and every California Agency Owners' economic interest in their respective books of business as demonstrated by the series of graphs showing the loss in value of the California Agency Owners' books of business just prior to ALLSTATE instituting its scheme in early 2008 as represented by the reduction in the multiples used to calculate the purchase prices for California based Agencies over that time from approximately 4.0 to approximately 2.0 as tracked by PPC Loan (which upon information and belief is the largest, primary and ALLSTATE recommended lender used by persons to finance the purchase of an ALLSTATE books of business/agencies).

11

42.     Starting within the last four years, ALLSTATE has breached its agreement with the Allstate Agency Owners by, amongst other things, systematically failing to approve qualified buyers presented to ALLSTATE by Allstate Agency Owners, including but not limited to ALLSTATE arbitrarily and capriciously rejecting (i.e. failing to consider and/or failing to use good faith in exercising its exclusive judgment to approve or disapprove of prospective buyers) the following potential buyers that are/were among the best and most successful Allstate insurance agency owners in California, and who were at the time ALLSTATE rejected them as potential buyers of other Allstate Agency Owners' businesses/agencies more than qualified buyers by any objective or subjective standard:

- Jon Boulware
- John Alsop
- Gene Johnson
- Ken Munaretto
- James Gardner

43.     ALLSTATE's systematic failure to consider in good faith what are/were clearly qualified buyers is part of a scheme instituted by ALLSTATE to substantially reduce the value of the Allstate Agency Owners' businesses as well as the number of Allstate Agency Owners at a pace ALLSTATE can control in order to prevent an immediate mass exodus of agents which would negatively impact ALLSTATE's ability to do business in California.  Plaintiffs are informed and believe that ALLSTATE's goal is to reduce the number of Allstate Agency Owners by as much as 30-60% (or more), but it wants to implement this plan in such a way so as not to have all of the Allstate Agency Owners quit over a very short time period which would destroy ALLSTATE's California business.

44.     Although ALLSTATE unilaterally drafted the written Agreement to provide it with the right to terminate any Allstate Agency Owner upon 90 days written notice, at the time of presenting the contract, at contracting, and continually thereafter, ALLSTATE represented to the Allstate Agency Owners that this provision would only be used to terminate agency owners that were determined to have engaged in illegal, unethical, or other explicitly wrongful conduct, and in fact, until within the

12

last four years ALLSTATE did not terminate individual Allstate Agency Owners upon 90 days written notice except when it determined that the Agent being terminated had engaged in illegal, unethical, or other explicitly wrongful conduct. However, within the last four years from the filing of this Action, ALLSTATE implemented a deceptive, misleading and pre-textual, quasi- performance based program which it used, and continues to use, as a pretext to justify termination of targeted Allstate Agency Owners at a pace that ALLSTATE could control. Allstate Agency Owners relied to their detriment on the reasonable belief that ALLSTATE would not terminate Allstate Agency Owners that did not engage in illegal, unethical, or other explicitly wrongful conduct, and that any performance based program implemented by ALLSTATE would be administered fairly and in good faith when Allstate Agency Owners made individual decisions to continue as Allstate Agency Owners, all to the very substantial benefit of ALLSTATE.

45. On or about November 18, 2002, ALLSTATE through its highest ranking executive officer in California, Hank Barge, transmitted an official communication to all of the Allstate Agency Owners in California calculated to keep the Allstate Agency Owners operating their respective business and not to terminate their relationships with ALLSTATE (the "Barge Letter"), which effectively stated that terminations based on poor performance would only apply to the very worst performing agencies in any given territory. (A true and correct copy of the November 18, 2002 Barge Letter is attached hereto as Exhibit F and made a part hereof by this reference)

46. Plaintiffs and the Plaintiffs' Class relied on this and other representations in deciding to continue their relationship with ALLSTATE and expending their energies and moneys in continuing to operate their Agencies as R3001 Allstate Agency Owners and to promote ALLSTATE and ALLSTATE products and foregoing other business opportunities such that ALLSTATE should be estopped from implementing a performance based termination plan other than in accord with what is set forth in the terms of the Barge Letter.

47. The Agreement (as well as its subsequent amendment(s) and supplements) all of which were drafted solely by ALLSTATE without input from, or negotiation with, the Allstate Agency Owners allows ALLSTATE to implement various performance based incentive and bonus programs, but it does not include a contractual right allowing ALLSTATE to implement a performance based

13

1   termination program.

2       48.     Despite ALLSTATE's failure to include within the written Agreement for such a

3   performance based termination program, ALLSTATE implemented just such a program within the last

4   4 years and has improperly administered said program in violation of the Allstate Agency Owners'

5   rights and financial interests derived therefrom in their respective businesses.

6       49.     ALLSTATE's unfair, unlawful, fraudulent and deceptive business practices as

7   described herein have resulted in harm to the individual Plaintiffs and the Plaintiff Class in that

8   ALLSTATE's conduct has significantly driven down the value of the independent Allstate Agency

9   Owner's businesses/agencies, and in many instances, including some of the named Plaintiffs and some

10  members of the Plaintiff Class, were forced by ALLSTATE's conduct as alleged herein, to sell their

11  businesses/agencies many years before they would have done so but for ALLSTATE's conduct, as

12  well as at much lower prices than they would have received for their businesses/agencies but for

13  ALLSTATE's conduct, all to their direct harm and damage.

14      50.     Plaintiff Abdelnour, an Allstate Agency Owner for over 18 years and an Allstate Agent

15  for over 11 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when

16  she was notified in writing by ALLSTATE that her agency had fallen below ALLSTATE's arbitrary

17  and unrealistic performance standards and that her agency was subject to termination with her

18  economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in

19  the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no

20  intention of allowing Abdelnour to bring her agency into compliance with ALLSTATE's performance

21  standards as evidenced by the fact that shortly after ALLSTATE notified Abdelnour that her agency

22  had fallen below ALLSTATE's acceptable performance standards ALLSTATE notified prospective

23  buyers that Abdelnour's agency was available for purchase and further, by the fact that prior to

24  receiving the written notice top ALLSTATE management personnel had communicated to Allstate

25  Agency Owners, such as Abdelnour, that ALLSTATE intended to reduce by 30% to 60% its existing

26  agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone".

27  ALLSTATE's conduct forced Abdelnour, along with numerous other agency owners who were

28  experiencing this same treatment from ALLSTATE, into a position whereby she was forced to seek a

THIRD AMENDED COMPLAINT

buyer of her economic interest earlier than she had ever planned and against her wishes. Further, she was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Abdelnour's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Abdelnour, no ability to negotiate a fair sale price. Under these circumstances Abdelnour did in fact sell her economic interest well before she had ever intended and at a price well below what she could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Abdelnour, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business. Specifically, in the case of Abdelnour she was provided a "soft letter" from ALLSTATE in conjunction with a face-to-face meeting with ALLSTATE manager Diane Stapleton putting her on notice that if her agency did not achieve unrealistic goals within 6 months she would be receiving a termination letter. It had previously been made clear to Abdelnour through statements made by Hank Barge, Heidi Palmer, and other ALLSTATE management that ALLSTATE was only accepting buyers who had been pre-approved by Allstate. At the time of the "soft letter" and the Diane Stapleton meeting ALLSTATE directed a pre-approved buyer Kenny Rickard to Abdelnour to purchase Abdelnour's economic interest in her book of business. Abdelnour, under these circumstances and feeling she had no choice sold her book of business not at a time of her choosing and at a price that was below market value had ALLSTATE not engaged in the above-described activity which artificially and negatively effected the market Abdelnour had been approached regularly by prospective buyers prior to the above-described circumstances but in light of the deadline she was under to sell and Allstate's policy of only considering pre-approved buyers she believed any emergency attempt to locate a former interested buyer would be futile.

51.    Plaintiff Aragon, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE'S misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic

interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement. ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Aragon to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that prior to receiving the written notice top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone". ALLSTATE's conduct forced Aragon, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes. Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Aragon's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Aragon, no ability to negotiate a fair sale price. In Aragon's case his eventual buyer Ken Cook, armed with the knowledge of Aragon's predicament, waited until the day Aragon was to return his book of business to ALLSTATE in exchange for the termination pay and attempted to renegotiate the purchase price to a number closer to the termination payment Aragon was to receive from ALLSTATE. Under these circumstances Aragon did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Aragon, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business  Prior to selling to Cook, Aragon, had learned that ALLSTATE would not consider any potential buyer whom Aragon might present to ALLSTATE but rather ALLSTATE would only approve buyers who were pre-approved by Allstate.  Aragon learned this as a result of statements made by Hank Barge, Heidi Palmer and others that made it clear ALLSTATE would only authorize sales to persons pre-approved by Allstate.  Aragon also learned this through conversations he had with other Allstate agency owners, such as Tony Paoletta, who had communications with ALLSTATE management and was told only pre-approved buyers would be

16

authorized to purchase Aragon's economic interest in his book of business.  Cook was one of Allstate's pre-approved buyers and Aragon had no choice but to sell to Cook.  At the time of the sale to Cook, Aragon had additional interested buyers, Tony Paoletta and Michael Aragon, whom he did not even present to ALLSTATE in light of Allstate's policy that it would not consider anyone not pre-approved by Allstate.

52.    Plaintiff Avila, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE'S misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Avila to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that shortly after ALLSTATE notified Avila that his agency had fallen below ALLSTATE's acceptable performance standards ALLSTATE notified prospective buyers that Avila's agency was available for purchase, and further, by the fact that prior to receiving the written notice top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone". ALLSTATE's conduct forced Avila, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.  Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Avila's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Avila, no ability to negotiate a fair sale price. In Avila's case he had negotiated a below market sale to a James Munoz whom ALLSTATE had yet to approve at the time this lawsuit was filed and since the lawsuit was filed ALLSTATE has taken no action to either complete the termination of Avila or otherwise complete the sale of Avila's economic interest. ALLSTATE engaging in the above described

17

misconduct was orchestrated to frustrate and interfere with the most important benefit which Avila, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.  The value of Avila's economic interest has been substantially reduced due to ALLSTATE's misconduct.

53.     Plaintiff Collier, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Collier to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that prior to receiving the written notice top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone".  ALLSTATE's conduct forced Collier, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.  Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Collier's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Collier, no ability to negotiate a fair sale price. In Collier's case, he presented a qualified buyer to ALLSTATE for approval, Ken Munaretto, whom ALLSTATE never approved.  With the termination payment looming Collier sold to a buyer whom ALLSTATE presented to Collier named, Omar Zaki.  Mr. Zaki, armed with the knowledge of Collier's predicament, negotiated a purchase price close to the termination payment Collier was to receive from ALLSTATE.  Under these circumstances Collier did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate

THIRD AMENDED COMPLAINT

and interfere with the most important benefit which Collier, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.

54.     Plaintiff Comparetto, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.   ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Comparetto to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that prior to receiving the written notice top ALLSTATE management personnel had communicated to Allstate Agency Owners, including Comparetto, that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone". ALLSTATE's conduct forced Comparetto, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.  Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Comparetto's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Comparetto, no ability to negotiate a fair sale price. In Comparetto's case his eventual buyer Nick Christiansen, armed with the knowledge of Comparetto's predicament, negotiated a purchase price close to the termination payment which Comparetto was to receive.  Under these circumstances Comparetto did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Comparetto, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.  Prior to

1   selling to Christiansen, Comparetto had learned that ALLSTATE would not consider any potential
2   buyer whom Comparetto might present to ALLSTATE but rather ALLSTATE would only approve
3   buyers who were pre-approved by Allstate.  In fact, at the time that Comparetto sold his book of
4   business to Christianson (whom Comparetto had serendipitously discovered was a pre-approved
5   buyers), he had several Allstate Agency owners who contemporaneously expressed an interest in
6   buying his book of business, including but not limited to, John Alsop, Omar Zaki, and Sean McMullin,
7   to any one of whom Comparetto was ready to sell his book of business and all of whom were prepared
8   to competitively bid against one another to buy Comparetto's book of business, on the condition that
9   ALLSTATE would "approve" them as potential buyers.  Comparetto spoke with his immediate
10  ALLSTATE sales managers, Erica Pompa, and asked if any of these current Allstate Agency owners
11  that wanted to buy his business were "qualified" and/or considered "approved" potential buyers that he
12  could submit to ALLSTATE to buy his book of business.  Erika Pompa told him that none of the
13  potential buyers mentioned by Comparetto were "approved" and that they would not be approved by
14  ALLSTATE to buy his book of business.  Comparetto then asked Ms. Pompa for a list of "approved"
15  buyers that he could contact, but she refused to provide him with any names of "approved" potential
16  buyers, leaving Comparetto with no "approved" buyer that he could submit to Allstate.  In addition to
17  his conversations with Ms. Pompa, Comparetto also had conversations with ALLSTATE management
18  personnel, Mark Shores and Diane Stapleton, in which they stated that ALLSTATE would not approve
19  any potential buyers that were not "pre-approved" by Allstate.  Furthermore, Comparetto had
20  conversations with other Allstate agency owners who had similar communications with ALLSTATE
21  management and who had prospective outside buyers summarily rejected by Allstate.  By pure luck,
22  Comparetto serendipitously became aware that his son-in-law was being strongly "encouraged" by
23  ALLSTATE management to buy additional books of business, and thus Christianson was a "pre-
24  approved" and qualified buyer.  Therefore, Comparetto and Christianson came to an agreement for the
25  sale of Comparetto's book to Christianson, and Comparetto approached his territorial manager, Heidi
26  Palmer, and told her that he wanted to sell his book of business to Christianson.  Ms. Palmer
27  immediately challenged Comparetto on whether or not Christianson was an "approved" buyer that
28  could be submitted by Comparetto to Allstate, and indicated to Comparetto that she did not believe

THIRD AMENDED COMPLAINT

Christianson was an "approved" buyer.  Comparetto then informed Ms. Palmer that Christianson must be an approved buyer since Christianson's manager had been contemporaneously encouraging Christianson to buy other books of business from different Allstate Agency owners.   Being the only potential buyer known to Comparetto (as he was the only buyer that Comparetto knew was pre-approved),Comparetto's only choice was to sell to Christiansen, however at the time of the sale to Christiansen Comparetto had additional interested buyers, including but not limited to, John Alsop, Omar Zaki, and Sean McMullin whom Comparetto did not even present to ALLSTATE in light of Allstate's policy that it would not consider anyone not pre-approved by Allstate.

55.     Plaintiff Johnston, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.   ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Johnston to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that prior to receiving the written notice top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies, and that as a result of ALLSTATE's plans going forward "50% of you will be gone". ALLSTATE's conduct forced Johnston, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.   Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Johnston's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Johnston, no ability to negotiate a fair sale price.  With the termination payment looming Johnston sold to a buyer whom ALLSTATE had pre-approved named, Jason Van Noy.   Mr. Van Noy, armed with the knowledge of Johnston's predicament, negotiated a purchase price close to the termination payment

THIRD AMENDED COMPLAINT

Johnston was to receive from ALLSTATE.  Under these circumstances Johnston did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Johnston, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.  Prior to selling to Van Noy, Johnston had learned that ALLSTATE would not consider any potential buyer whom Johnston might present to ALLSTATE but rather ALLSTATE would only approve buyers who were pre-approved by Allstate. Johnston learned this through conversations with ALLSTATE management Hank Barge, Heidi Palmer, Jaime Cuenca and Ray Brooks.  Van Noy was one of Allstate's pre-approved buyers and Johnston had no choice but to sell to Van Noy.  At the time of the sale to Van Noy Johnston had additional interested buyers, John Alsop and Gary Whithy whom Johnston did not even present to ALLSTATE in light of Allstate's policy that it would not consider anyone not pre-approved by Allstate.

56.    Plaintiff Lemus, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Lemus to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that prior to receiving the written notice, top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone".  ALLSTATE's conduct forced Lemus, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a Buyer of his economic interest earlier than he had ever planned and against his wishes.  Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by

22

1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Lemus', were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Lemus, no ability to negotiate a fair sale price. In Lemus' case, he presented a qualified buyer to ALLSTATE for approval, Gene Johnson, whom ALLSTATE never approved although Johnson was an experienced and well qualified existing Allstate Agency Owner. With the termination payment looming Collier sold to an inexperienced outside buyer whom ALLSTATE did approve named, Joseph Dalton. Mr. Dalton, armed with the knowledge of Lemus' predicament, negotiated a purchase price close to the termination payment Lemus was to receive from ALLSTATE. Under these circumstances Lemus did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Lemus, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.

57.    Plaintiff Munsell, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when she was notified by top ALLSTATE management personnel that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone". ALLSTATE's conduct forced Munsell, along with numerous other agency owners who were faced with this same treatment from ALLSTATE, into a position whereby she was forced to seek a buyer of her economic interest earlier than she had ever planned and against her wishes. With the termination payment looming Munsell sold to a buyer whom ALLSTATE presented to her named, Doug Moore.    Further, she was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Munsell's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Munsell, no ability to negotiate a fair sale price. Under these circumstances Munsell did in fact sell her economic interest well before she had ever intended and at a price well below what she could and should have

received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Munsell, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business. Prior to selling to Moore, Munsell, had learned that ALLSTATE would not consider any potential buyer whom Munsell might present to ALLSTATE but rather ALLSTATE would only approve buyers who were pre-approved by Allstate.  Munsell learned this through conversations with ALLSTATE management, Heidi Palmer, and through conversations she had with other Allstate agency owners who had similar communications with ALLSTATE management.  Moore was one of Allstate's pre-approved buyers and Munsell had no choice but to sell to Moore.  At the time of the sale to Moore, Munsell had at least one additional interested buyer, John Alsop, whom Munsell did not even present to ALLSTATE in light of Allstate's policy that it would not consider anyone not pre-approved by ALLSTATE.

58.    Plaintiff Paoletta, an Allstate Agency Owner for over 9 years, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Paoletta to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that shortly after ALLSTATE notified Paoletta that his agency had fallen below ALLSTATE's acceptable performance standards ALLSTATE notified prospective buyers that Paoletta's agency was available for purchase, and further, by the fact that prior to receiving the written notice top ALLSTATE management personnel had communicated to Allstate Agency Owners, such as Paoletta, that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you will be gone". ALLSTATE's conduct forced Paoletta, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.  Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct

1    had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2.

2    communicating to the market that agencies, including Paoletta's, were subject to a forced sale back to

3    ALLSTATE at a below market termination payment which left agency owners, including Paoletta, no

4    ability to negotiate a fair sale price. In Paoletta's case he presented potential buyers Brian Shea and

5    then Mark Holtzman to ALLSTATE for approval and both were rejected by ALLSTATE without

6    explanation even though Paoletta had negotiated a below market sale to them.  Since the filing of the

7    lawsuit ALLSTATE has taken no action to either complete the termination of Paoletta or otherwise

8    complete the sale of Paoletta's economic interest. ALLSTATE engaging in the above described

9    misconduct was orchestrated to frustrate and interfere with the most important benefit which Paoletta,

10   and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of

11   their economic interest in their respective books of business.   The value of Paoletta's economic

12   interest has been substantially reduced due to ALLSTATE's misconduct.

13          59.    Plaintiff Romero, an Allstate Agency Owner for over 14 years and an Allstate Agent

14   for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when

15   he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary

16   and unrealistic performance standards and that his agency was subject to termination with his

17   economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in

18   the Agreement.   ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no

19   intention of allowing Romero to bring his agency into compliance with ALLSTATE's performance

20   standards as evidenced by the fact that prior to receiving the written notice, top ALLSTATE

21   management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to

22   reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward

23   "50% of you will be gone". ALLSTATE's conduct forced Romero, along with numerous other agency

24   owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was

25   forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.

26   Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the

27   market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the

28   market that agencies, including Romero's, were subject to a forced sale back to ALLSTATE at a

THIRD AMENDED COMPLAINT

below market termination payment which left agency owners, including Romero, no ability to negotiate a fair sale price. In Romero's case, he presented at least two qualified buyers to ALLSTATE for approval, Gloria Huizer and Mike Blake, whom ALLSTATE never approved.   With the termination payment looming Romero sold to a buyer whom ALLSTATE presented to Romero named, Roger Sowell.  Mr. Sowell, armed with the knowledge of Romero's predicament, negotiated a purchase price close to the termination payment Romero was to receive from ALLSTATE.  Under these circumstances Romero did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Romero, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.

60.    Plaintiff Schiefen, an Allstate Agency Owner for over 8 years who acquired his agency from his father who had been with Allstate for over 40 years prior to that, was injured by ALLSTATE'S misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Schiefen to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that prior to receiving the written notice, top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies, and that as a result of ALLSTATE's plans going forward "50% of you will be gone".  ALLSTATE's conduct forced Schiefen, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes. Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Schiefen's, were subject to a forced sale back to ALLSTATE at a below market termination payment

26

which left agency owners, including Schiefen, no ability to negotiate a fair sale price. In Schiefen's case he was told by ALLSTATE management personnel Leslie Carpenter that ALLSTATE would not consider any buyer Schiefen located who was not already on Allstate's pre-approved list.  His eventual buyer Ted Bustamante was preselected by ALLSTATE and armed with the knowledge of Schiefen's predicament, renegotiated the purchase price to a number closer to the termination payment Schiefen was to receive from ALLSTATE.  Under these circumstances Schiefen did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Schiefen, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.  At the time of Schiefen's sale to Bustamante, Scheifen had other interested potential buyers whom he did not even present to ALLSTATE in light of Allstate's stated policy that ALLSTATE would not consider any potential buyer who ALLSTATE had not already pre-approved. Potential buyers whom Scheifen did not present to ALLSTATE for approval because of Allstate's policy included, Wendy Corr, Adriana Boheim, Frank Lucito, Robert Feldman and Kelly and John Rosdale.

61.    Plaintiff Taylor, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement.  ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention of allowing Taylor to bring his agency into compliance with ALLSTATE's performance standards as evidenced by the fact that shortly after ALLSTATE notified Taylor that his agency had fallen below ALLSTATE's acceptable performance standards ALLSTATE notified prospective buyers that Taylor's agency was available for purchase and further, by the fact that prior to receiving the written notice, top ALLSTATE management personnel had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its existing agencies, and that as a result of

ALLSTATE's plans going forward "50% of you will be gone".  ALLSTATE's conduct forced Taylor, along with numerous other agency owners who were experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes.  With the termination payment looming Taylor sold to a buyer whom ALLSTATE presented to him named, David Petri.   Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Taylor's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Taylor, no ability to negotiate a fair sale price. Under these circumstances Taylor did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Taylor, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business.  Prior to selling to Petri, Taylor, had learned that ALLSTATE would not consider any potential buyer whom Taylor might present to ALLSTATE but rather ALLSTATE would only approve buyers who were pre-approved by Allstate.  Taylor learned this through conversations with ALLSTATE management, Heidi Palmer. and Craig Timmons and through conversations he had with other Allstate agency owners who had similar communications with ALLSTATE management. Petri was one of Allstate's pre-approved buyers and Taylor had no choice but to sell to Petri.  At the time of Taylor's sale to Petri, Taylor had other interested potential buyers whom he did not even present to ALLSTATE in light of Allstate's stated policy that ALLSTATE would not consider any potential buyer who ALLSTATE had not already pre-approved. One potential buyer whom Taylor did not present to ALLSTATE for approval because of ALLSTATE's policy was David Achenbach.

62.    Plaintiff Webb, an Allstate Agency Owner for over 12 years and an Allstate Agent for over 15 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified by top ALLSTATE management personnel that ALLSTATE intended to reduce by 30% to 60% its existing agencies and that as a result of ALLSTATE's plans going forward "50% of you

will be gone". ALLSTATE's conduct forced Webb, along with numerous other agency owners who were faced with this same treatment from ALLSTATE, into a position whereby he was forced to seek a buyer of his economic interest earlier than he had ever planned and against his wishes. Further, he was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1. refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that agencies, including Webb's, were subject to a forced sale back to ALLSTATE at a below market termination payment which left agency owners, including Webb, no ability to negotiate a fair sale price. With the termination payment looming Webb sold to a buyer whom ALLSTATE presented to him named, Jeremy Chavez. Under these circumstances Webb did in fact sell his economic interest well before he had ever intended and at a price well below what he could and should have received prior to ALLSTATE engaging in the above described misconduct which was orchestrated to frustrate and interfere with the most important benefit which Webb, and other Allstate Agency Owners, obtained under the Agreement, their ownership in and value of their economic interest in their respective books of business. Prior to selling to Chavez, Webb had learned that Allstate would not consider any potential buyer whom Webb might present to Allstate but rather Allstate would only approve buyers who were pre-approved by Allstate. Webb learned this through conversations with Allstate management personnel Mike Tilky and David Milner and through conversations he had with other Allstate agency owners who had similar communications with Allstate management. Chavez was one of Allstate's pre-approved buyers and Webb had no choice but to sell to Chavez. At the time of the sale to Chavez Webb had at least one additional interested buyer, Dave Nobel, whom Webb did not even present to Allstate for approval in light of Allstate's stated policy that it would only consider pre-approved buyers for purchase of Webb's economic interest.,

63.     Plaintiff Strader, an Allstate Agency Owner for over 14 years and an Allstate Agent for over 6 years prior to that, was injured by ALLSTATE's misconduct as herein above alleged when he was notified in writing by ALLSTATE that his agency had fallen below ALLSTATE's arbitrary and unrealistic performance standards and that his agency was subject to termination with his economic interest being assigned to ALLSTATE in exchange for the termination payment set forth in the Agreement. ALLSTATE's notice was pre-textual and in bad faith and ALLSTATE had no intention

THIRD AMENDED COMPLAINT

1   of allowing Avila to bring his agency into compliance with ALLSTATE's performance standards as

2   evidenced by the fact that prior to receiving the written notice top ALLSTATE management personnel

3   had communicated to Allstate Agency Owners that ALLSTATE intended to reduce by 30% to 60% its

4   existing agencies, and that as a result of ALLSTATE's plans going forward "50% of you will be

5   gone". ALLSTATE's conduct forced Strader, along with numerous other agency owners who were

6   experiencing this same treatment from ALLSTATE, into a position whereby he was forced to seek a

7   buyer of his economic interest earlier than he had ever planned and against his wishes.  Further, he

8   was forced to seek a buyer at a time when ALLSTATE's misconduct had depressed the market by 1.

9   refusing and failing to consider potential Buyers in good faith; 2. communicating to the market that

10  agencies, including Strader's, were subject to a forced sale back to ALLSTATE at a below market

11  termination payment which left agency owners, including Strader, no ability to negotiate a fair sale

12  price. In Strader's case he was in negotiations with Ken Cook for a below market sale which

13  ALLSTATE had yet to approve at the time this lawsuit was filed and since the lawsuit was filed

14  ALLSTATE has taken no action to either complete the termination of Strader or otherwise complete

15  the sale of Strader's economic interest. ALLSTATE engaging in the above described misconduct was

16  orchestrated to frustrate and interfere with the most important benefit which Strader, and other Allstate

17  Agency Owners, obtained under the Agreement, their ownership in and value of their economic

18  interest in their respective books of business.  The value of Strader's economic interest has been

19  substantially reduced due to ALLSTATE's misconduct.

20        64.    From the late 1990s when ALLSTATE converted its agent force from employees to

21  independent contractors, until within four years prior to the date that this Action was filed,

22  ALLSTATE lived up to the promises and representations that it made to the Allstate Agency Owners

23  and fulfilled its contractual obligations (whether express or implied by law) to the Allstate Agency

24  Owners.

25        65.    However, starting within the last four years before the filing of the original Complaint

26  in this lawsuit, ALLSTATE breached its Agreement with the Allstate Agency Owners, by taking

27  actions deliberately to deprive the Allstate Agency Owners of the benefits of the agreement that they

28  made when they contracted to be independent contractors operating as Allstate Agency Owners in

30

THIRD AMENDED COMPLAINT

California by, among other things: depriving the Allstate Agency Owners of any true ownership interest in their respective businesses and micro-managing the Allstate Agency Owners to the extent that the Allstate Agency Owners are no longer engaged in a distinct occupation or business from ALLSTATE, as Allstate Agency Owners have effectively become little more than operational level employees of ALLSTATE, or at the most, low level managers/supervisors of local branch offices of ALLSTATE, with ALLSTATE dictating, among other things, (a) the hours that the branch must be open, (b) the days of the week/month that the branch must be open, (c) how the Allstate Agency Owners and the supposed employees/staff of the formerly independent agencies perform even the most routine functions related to the business, (d) that the agencies must use ALLSTATE's phone and computer/email/Internet related systems to conduct the agencies' business, thus effectively forcing the Allstate Agency Owners to run the agencies as employees of ALLSTATE's regular business, which is not what the Allstate Agency Owners were promised or expected when they entered into the Agreement, instead believing that they were true independent contractors/business owners able to run/manage their businesses as they saw fit, and to sell their business if/when they wanted to a reasonably qualified buyer at a fair price established by an open market.  So while the Allstate Agency Owners believed they were entering into a business relationship where the Allstate Agency Owners owned and controlled their own, independent businesses (which is how things actually worked until within the last 4 years prior to the filing of this Action), the dramatic changes in ALLSTATE's actions directed at the Allstate Agency Owners has resulted in the Allstate Agency Owners acting as ALLSTATE employees and not as business owners/ independent contractors, which is a breach by ALLSTATE of the implied covenant of good faith and fair dealing and a breach of the express terms of the Agreement provisions I.B and I.D. depending on the version which was signed by each respective Plaintiff and by each prospective member of the Plaintiffs' Class.

66.    Allstate engaged in a number of activities some of which pre-dated September 1, 2007 (4 years prior to the filing of this action) to one degree or another, but which in and of themselves had not yet had the cumulative effect of creating conditions sufficient to convert the agency owners from independent contractors to that of an Allstate employee in breach of the Agreement.  These pre-existing conditions included the following facts:

THIRD AMENDED COMPLAINT

a)    ALLSTATE requiring the Agencies' employees who were going to act as sales producers to attend and complete a one-time, multi-day mandatory orientation/training program designed and run by ALLSTATE before those Agency employees were given binding authority to write ALLSTATE insurance policies;

b)    ALLSTATE dictating that the Agencies be open for business during certain specified normal business hours;

c)    ALLSTATE asserting its ownership over the phone numbers used by the Agencies, and requiring the Agencies to use ALLSTATE's call forwarding and ALLSTATE's messaging center, including requiring all Agencies to use ALLSTATE's email system to manage their books of business.

d)    ALLSTATE mandating that the Agency Owners use ALLSTATE's computer system in order to conduct, organize and track the Agencies' insurance sales business, including for the Agency Owners and their employees to view their customer information and to write any new business/policies.

e)    ALLSTATE controlling the physical location of Agencies, not only in approving the initial location of a respective Agency, but also dictating whether or not an Agency could move locations, which also required ALLSTATE's pre-approval.

f)    ALLSTATE dictating to the Agency Owners what vendors to contract with (i.e. requiring use of specified "Yellow Page" Vendors, wiring/computer specialists) when they were setting up their respective office location.

g)    ALLSTATE requiring the Agencies to deposit funds received from customers within certain extremely rigid time parameters and into ALLSTATE controlled accounts.

32

h)     ALLSTATE mandating that each of the Agencies' employees be assigned ALLSTATE email, ALL STATE passwords and ALLSTATE agent identification numbers so that the Agencies' employees would have to utilize the ALLSTATE email and intra-net systems in order to perform their duties at the Agency, and so that ALLSTATE could monitor and control how the Agencies' employees performed their respective duties.

67.    Within four years of the filing of the original Complaint in this action on September 1, 2011 (i.e. from September 1, 2007 and later) ALLSTATE significantly increased its level of oversight, direction and micromanagement of the Allstate Agency Owners and the Allstate Agency Owners' employees/staff, such that when these additional obligations were combined with the pre-existing obligations, the cumulative effect was that the Allstate Agency Owners (as well as the Allstate Agency Owners' staff) became employees of ALLSTATE. The new and additional obligations which ALLSTATE implemented after September 1, 2007 which resulted in a change of agency owner status include, but are not limited to, the following:

a)     ALLSTATE converting a performance based bonus program to a performance based termination program which required Allstate Agency Owners to achieve specified sales quotas or risk termination. Prior to the four years before the filing of this lawsuit, ALLSTFATE had expressly stated that such a program and its accompanying expected results was not intended as a quota system, and indeed what ALLSTATE had designated previously as expected results during that period were easily attainable, minimum bench marks. However, starting in calendar year 2008, the Resources For Growth ("RFG") converted bonus-to-termination program implemented a severe quota based termination program administered by ALLSTATE in such a way as to dictate and control how the Allstate Agency Owners ran their offices by compelling the Allstate Agency Owners to direct their own resources (including the Allstate Agency Owners'

moneys spent on sales and marketing expenses) and efforts (both the efforts of the Allstate Agency Owners as well as their staff/employees) to the specific products and polices which ALLSTATE designated as priorities under the RFG program or face termination for failing to meet the new, extremely high, quotas specified by ALLSTATE as part of the RFG termination program;

b)   Requiring staff/employees of the Allstate Agency Owners to attend multiple, numerous, and mandatory organizational meetings run by ALLSTATE (at many of which the Agency Owners were not attendees) in which ALLSTATE trained and dictated how the Allstate Agency Owners' staff/employees must perform even the most basic tasks, including but not limited to, how the staff/employees interacted with both current and potential customers, and the methods used to sell insurance policies and run the agencies, most of which was not done before September 1, 2007 and for the rest was done to an extent significantly and materially greater than before September 1, 2007;

c)   ALLSTATE instituted a "mystery shopper" program whereby ALLSTATE personnel would call the various California based Allstate Agencies pretending to be customers for the sole purpose of verifying that the staff/employees of each Allstate Agency Owner were handling sales calls in the manner in which ALLSTATE had trained them and dictated that such calls be handled, with ALLSTATE managers confronting both the Allstate Agency Owners and their staff/employees directly if they did not handle the mystery shopper call as the staff/employees were trained to do by ALLSTATE;

d)   ALLSTATE management began to directly, regularly and routinely communicate with the staff/employees of the Allstate Agency Owners (i.e. purposefully bypassing the Allstate Agency Owners) on matters of what to products they must sell and mandatory

THIRD AMENDED COMPLAINT

policies/procedures effecting both the time and manner by which they performed their duties at the supposedly independent agencies;

e)   ALLSTATE management communicating directly with the Allstate Agency Owners' staff/employees and disclosing confidential information regarding the compensation earned by the Agency Owners from ALLSTATE and advising the Agencies' employees that they should obtain a share of the commissions and bonuses paid by ALLSTATE to the Agency Owners since the Agencies' employees were a large part of the success of the Agencies;

f)   ALLSTATE began emailing a list of required tasks called a "work queue" to the Allstate Agency Owners and requiring that the Agency Owner assign each "task" to one of his/her staff/employees which was recorded on the ALLSTATE's Impact computer system, then ALLSTATE management monitoring the Impact computer system to insure that the staff member/employee assigned to each task satisfactorily completed each assigned task within a very short time, and confronting both the staff member/employee and the Allstate Agency Owner if the task was not completed in a satisfactory and timely manner;

g)   Forcing Allstate Agency Owners to have their staff/employees (at the Allstate Agency Owners' expense) regularly and routinely participate in telephone-sales promotions scheduled, run and directed by ALLSTATE either after-hours at the agency location, or at an ALLSTATE facility (usually following one of the newly instituted mandatory training sessions);

h)   ALLSTATE requiring the Allstate Agency Owners to purchase/use particular furniture (including where it must be placed in the office), as well as the particular paint.

THIRD AMENDED COMPLAINT

i)    ALLSTATE requiring Agencies to inspect vehicles and obtain completed documents from customers whose business was written by the CIC (i.e. the ALLSTATE call center) even though the Agency Owners would not receive a commission or any other compensation for this work.

j)    ALLSTATE requiring both the Agency Owners and their employees to complete the WOOPLE training, which covered standardized sales techniques and approaches for selling insurance policies to prospective and existing clients using the ALLSTATE system instead of the Agency Owners' individual sales methods or approaches.

k)    ALLSTATE requiring the Agency Owners to buy and use ALLSTATE's proprietary software system, for which ALLSTATE charged the Agency Owners $75.00 per month per computer, as well as required the Agency Owners to buy and use specific computer and computer related hardware (e.g. printers, IBM monitors, keyboard, etc.)

l)    Allstate requiring the Agency Owners to do home re-inspections on non-renewals.

m)    ALLSTATE requiring the Agency Owners to fax them trailing documents on every new policy written;

n)    ALLSTATE secretly monitoring the e-mail accounts of ALLSTATE customers and notifying Agency Owners by e-mail when any of their customers were shopping insurance on the Internet, and ALLSTATE requiring Agency Owners to contact those customers within 24 hours of that e-mail notice, and specifically instructing Agency Owners not to disclose that ALLSTATE was aware the customer was shopping for new insurance;

o)    ALLSTATE managers regularly and routinely coming to the Allstate Agency Owners' offices and sitting in to listen and monitor interaction between the agency staff/employees and customers in order to insure that the staff/employee was properly employing the methods dictated by ALLSTATE.

36

68.    Upon information and belief, there are non-R3001 independent agents operating in California that write insurance policies through ALLSTATE but that are not required to conduct their businesses under the same rigid control by ALLSTATE as the R3001 Agents (the named Plaintiffs and the proposed Plaintiffs' Class).

69.    In addition, within the last four years prior to the filing of this Action, ALLSTATE implemented a performance based termination program in violation of Allstate Agency Owners' rights and used it as a means to force Allstate Agency Owners to sell their businesses (either to ALLSTATE or to certain preferred individuals selected by ALLSTATE's California based management team) at severely under-market values; and engaged in conduct designed to so severely restrict the market for the Allstate Agency Owners to sell their businesses (i.e. ALLSTATE'S bad faith application of its exclusive judgment to approve or disapprove potential buyers as described herein), that it effectively destroyed any semblance of a market in which the Allstate Agency Owners could sell their businesses. These actions, among others, so substantially reduced the value of the hard earned equity in the Allstate Agency Owners' businesses, among other things, that ALLSTATE effectively deprived the Allstate Agency Owners of their ownership in their respective businesses. The conduct of ALLSTATE, as above-described, frustrated the Plaintiffs' and the Plaintiff Class' expectations and rights to the benefits of the contract, which is a breach of the implied covenant of good faith and fair dealing.

70.    The Allstate Agency Owners each also have/had prospective economic relationships with their customers. Specifically, each Allstate Agency Owner had express contractual rights to continued commissions as set forth in the Agreement and a reasonable expectation that their financially beneficial relationship with their customers would continue into the future until such time as each Allstate Agency Owner elected to sell or transfer his or her rights under the Agreement to a willing buyer in a free and open market.

71.    The Allstate Agency Owners each also had prospective economic relationships with people that wanted to buy their businesses/agencies that ALLSTATE wrongfully rejected and that should have clearly been approved buyers.

THIRD AMENDED COMPLAINT

72.     All of these actions taken by ALLSTATE as described in this SAC, among others, were and are acts that interfered with Plaintiffs and the Plaintiff Class' prospective economic relationships with the Allstate Agency Owner's customers and with the third-parties who had agreed to buy the businesses of the Allstate Agency Owners but were wrongfully rejected by ALLSTATE.

<u>FIRST CAUSE OF ACTION</u>

<u>BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>

**(Plaintiffs (not Abdelnour) and the Plaintiff Sub-Classes One and Two against the Defendants)**

73.     Plaintiffs (except Abdelnour) and each of the Plaintiff sub-Class members one and two as defined in paragraph 97 herein class bring this cause of action and hereby reincorporate by reference all the allegations in paragraphs 1 though 72 as if they were set forth in full in this paragraph.

74.     At various times, each of the Plaintiffs and each of the Plaintiff Class members entered into a written contract (which on occasion was amended over time) identified throughout this TAC as the Agreement.

75.     Plaintiffs and the Plaintiff Class did all, or substantially all, of the significant things that the contract required them to do, and/or they were excused from having to do those things.

76.     All of the conditions required have occurred to trigger ALLSTATE's performance under the contract.

77.     By engaging in the acts alleged of it in this TAC, ALLSTATE unfairly and intentionally took acts that interfered with Plaintiffs' and the Plaintiff Class' right to receive the benefits of the contract.

78.     Because the uniform written contract between Plaintiffs and the Plaintiff Class, on the one hand, and ALLSTATE, on the other hand, provides ALLSTATE with unfettered discretion to affect certain rights of the Plaintiffs and the Plaintiff Class, the covenant of good faith and fair dealing implied in all contracts by California law imposed a duty upon ALLSTATE to exercise that discretion in good faith and in accordance with fair dealing.

79.     ALLSTATE's actions, as alleged in this TAC, were and continue to be unfair and taken in bad faith by it as conscious and deliberate acts that unfairly frustrate the agreed common purpose of

38

the contract and disappoints the reasonable expectations of Plaintiffs and the Plaintiff Class to their contract with ALLSTATE.

80.     These intentional, bad-faith acts by ALLSTATE were designed to frustrate the benefits that the Plaintiffs and the Plaintiff Class were to receive under the contract.

81.     Plaintiffs and the Plaintiff Class were, and continues to be, harmed as a direct result of ALLSTATE's conduct in violation of the implied covenant of good faith and fair dealing in that, among other things, Plaintiffs and the Plaintiff Class have lost significant sums by the diminution in the value of their respective businesses, many of the Plaintiffs and Plaintiff Class members have been forced to sell their businesses at well below their actual value resulting in damages in an amount equal to the actual value price for the businesses less the lower price that they received when they were forced to sell their business, and those Plaintiffs and Plaintiffs Class members that were forced to sell their businesses did so not only unwillingly, but long before they ever would have but for ALLSTATE's misconduct, thus costing them both lost past and future profits, all to their harm and injury.

## SECOND CAUSE OF ACTION
## BREACH OF WRITTEN CONTRACT
### (All Plaintiffs and the Entire Plaintiff Class against Defendants)

82.     Plaintiffs and the Plaintiff Class hereby reincorporate by reference all the allegations in paragraphs 1 though 81 as if they were set forth in full in this paragraph.

83.     Each of the Plaintiffs and the Plaintiff Class entered into to a written contract with ALLSTATE, which contract was on occasion amended unilaterally by ALLSTATE over time, but was and is identified throughout this TAC as the Agreement, Manual, Supplement and Standards.

84.     The Agreement between ALLSTATE and Plaintiffs Abdelnour, Aragon, Collier, Comparetto, Lemus, Romero, Strader, and Webb contained the following express language at paragraph I.B. "You are an Independent contractor for all purposes and not an employee of the Company. You will have full control of your time and the right to exercise independent judgment as to the time, place, and manner of performing your duties under this Agreement."

85.     The Agreement between ALLSTATE and Plaintiffs Avila, Johnson, Munsell, Paoletta,

Schiefen, and Taylor contained the following express language at paragraph I.D. "The relationship between the Company and the Agency... will be that of an independent contractor for all purposes."

86.     Paragraph III.A in all versions of the R3001 Agreement reads: "You have no authority to employ persons on behalf of the Company, and no employee of yours will be deemed to be an employee or agent of the Company, such employees at all times remaining your employees. You have sole and exclusive control over your labor and employee relations policies, and your policies relating to wages, hours, and working conditions of your employees. You have the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge your employees."

87.     However, starting within the last four years, ALLSTATE breached its Agreement with the Allstate Agency Owners, by taking actions deliberately to deprive the Allstate Agency Owners of the benefits of the agreement that they made when they contracted to be independent contractors operating as Allstate Agency Owners in California by, among other things: depriving the Allstate Agency Owners of any true ownership interest in their respective businesses and micro-managing the Allstate Agency Owners to the extent that the Allstate Agency Owners are no longer engaged in a distinct occupation or business from ALLSTATE, as Allstate Agency Owners have effectively become little more than operational level employees of ALLSTATE, or at the most, low level managers/supervisors of local branch offices of ALLSTATE, with ALLSTATE dictating, among other things, (a) the hours that the branch must be open, (b) and days of the week/month that the branch must be open, (c) how the Allstate Agency Owners and the supposed "staff" of the formerly independent agencies perform even the most routine functions related to the business, (d) that the agencies must use ALLSTATE's phone and computer/email/Internet related systems to conduct the agencies' business, thus effectively forcing the Allstate Agency Owners to run the agencies as employees in just a part of ALLSTATE's regular business, which is not what the Allstate Agency Owners were promised or expected when they entered into the Agreement, instead believing that they were true independent contractors/business owners able to run/manage their businesses as they saw fit, and to sell their business if/when they wanted to a reasonably qualified buyer at a fair price established by an open market. So while the Allstate Agency Owners believed they were entering into a business relationship where the Allstate Agency Owners owned and controlled their own, independent

businesses (which is how things actually worked until within the last 4 years prior to the filing of this Action), the dramatic changes in ALLSTATE's actions directed at the Allstate Agency Owners has resulted in the Allstate Agency Owners acting as ALLSTATE employees and not as business owners/ independent contractors, which is a breach of the express terms of the Agreement provisions I.B and I.D. depending on the version which was signed by each respective Plaintiff and by each prospective member of the proposed Plaintiffs' Class.

88.     Allstate engaged in a number of activities, some of which pre-dated September 1, 2007 (4 years prior to the filing of this action) to one degree or another, but which in and of themselves had not yet had the cumulative effect of creating conditions sufficient to convert the agency owners from independent contractors to that of an Allstate employee in breach of the Agreement.   These pre-September 2001 conditions included the following facts:

a)     ALLSTATE requiring the Agencies' employees who were going to act as sales producers to attend and complete a one-time, multi-day mandatory orientation/training program designed and run by ALLSTATE before those Agency employees were given binding authority to write ALLSTATE insurance policies;

b)     ALLSTATE dictating that the Agencies operate during certain specified business hours;

c)     ALLSTATE asserting its ownership over the phone numbers used by the Agencies, and requiring the Agencies to use ALLSTATE's call forwarding and ALLSTATE's messaging center, including requiring all Agencies to use ALLSTATE's email system to manage their books of business.

d)     ALLSTATE mandating that the Agency Owners use ALLSTATE's computer system in order to conduct, organize and track the Agencies' insurance sales business, including for the Agency Owners and their employees to view their customer information and to write any new business/policies.

41

e)    ALLSTATE controlling the physical location of Agencies, not only in approving the initial location of a respective Agency, but also dictating whether or not an Agency could move locations, which also required ALLSTATE's pre-approval.

f)    ALLSTATE dictating to the Agency Owners what vendors to contract with (i.e. requiring use of specified "Yellow Page" Vendors, wiring/computer specialists) when they were setting up their respective office location.

g)    ALLSTATE requiring the Agencies to deposit funds received from customers within certain extremely rigid time parameters and into ALLSTATE controlled accounts.

h)    ALLSTATE mandating that each of the Agencies' employees be assigned ALLSTATE email, ALL STATE passwords and ALLSTATE agent identification numbers so that the Agencies' employees would have to utilize the ALLSTATE email and intra-net systems in order to perform their duties at the Agency, and so that ALLSTATE could monitor and control how the Agencies' employees performed their respective duties.

89.    Within four years of the filing of the original complaint in this action on September 1, 2011 (i.e. September 1 , 2007 and forward) ALLSTATE significantly increased its level of oversight, direction and micromanagement of the Allstate Agency Owners and the Allstate Agency Owners' employees/staff, such that when these additional obligations were combined with the pre-existing obligations, the cumulative effect was that the Allstate Agency Owners (as well as the Allstate Agency Owners' staff/employees) became employees of ALLSTATE.  The new and additional obligations which ALLSTATE implemented after September 1, 2007 which resulted in a change of status from independent contractor to employee include, but are not limited to, the following:

a)    ALLSTATE converting a performance based bonus program to a performance based termination program which required Allstate Agency Owners to achieve specified sales quotas or risk termination.  Prior to the four years before the filing of this lawsuit,

ALLSTFATE had expressly stated that such a program and its accompanying expected results was not intended as a quota system, and indeed what ALLSTATE had designated previously as expected results during that period were easily attainable, minimum bench marks.  However, starting in calendar year 2008, the Resources For Growth ("RFG") converted bonus-to-termination program implemented a severe quota based termination program administered by ALLSTATE in such a way as to dictate and control how the Allstate Agency Owners ran their offices by compelling the Allstate Agency Owners to direct their own resources (including the Allstate Agency Owners' moneys spent on sales and marketing expenses) and efforts (both the efforts of the Allstate Agency Owners as well as their staff/employees) to the specific products and polices which ALLSTATE designated as priorities under the RFG program or face termination for failing to meet the new, extremely high, quotas specified by ALLSTATE as part of the RFG termination program;

b)      Requiring staff/employees of the Allstate Agency Owners to attend multiple, numerous, and mandatory organizational meetings run by ALLSTATE (at many of which the Agency Owners were not attendees) in which ALLSTATE trained and dictated how the Allstate Agency Owners' staff/employees must perform even the most basic tasks, including but not limited to, how the staff/employees interacted with both current and potential customers, and the methods used to sell insurance policies and run the agencies, most of which was not done before September 1, 2007 and for the rest was done to an extent significantly and materially greater than before September 1, 2007;

c)      ALLSTATE instituted a "mystery shopper" program whereby ALLSTATE personnel would call the various California based Allstate Agencies pretending to be customers for the sole purpose of verifying that the staff/employees of each Allstate Agency

THIRD AMENDED COMPLAINT

Owner were handling sales calls in the manner in which ALLSTATE had trained them and dictated that such calls be handled, with ALLSTATE managers confronting both the Allstate Agency Owners and their staff/employees directly if they did not handle the mystery shopper call as the staff/employees were trained to do by ALLSTATE;

d)      ALLSTATE management began to directly, regularly and routinely communicate with the staff/employees of the Allstate Agency Owners (i.e. purposefully bypassing the Allstate Agency Owners) on matters of what to products they must sell and mandatory policies/procedures effecting both the time and manner by which they performed their duties at the supposedly independent agencies;

e)      ALLSTATE management communicating directly with the Allstate Agency Owners' staff/employees and disclosing confidential information regarding the compensation earned by the Agency Owners from ALLSTATE and advising the Agencies' employees that they should obtain a share of the commissions and bonuses paid by ALLSTATE to the Agency Owners since the Agencies' employees were a large part of the success of the Agencies;

f)      ALLSTATE began emailing a list of required tasks called a "work queue" to the Allstate Agency Owners and requiring that the Agency Owner assign each "task" to one of his/her staff/employees which was recorded on the ALLSTATE's Impact computer system, then ALLSTATE management monitoring the Impact computer system to insure that the staff member/employee assigned to each task satisfactorily completed each assigned task within a very short time, and confronting both the staff member/employee and the Allstate Agency Owner if the task was not completed in a satisfactory and timely manner;

44

g)   Forcing Allstate Agency Owners to have their staff/employees (at the Allstate Agency Owners' expense) regularly and routinely participate in telephone-sales promotions scheduled, run and directed by ALLSTATE either after-hours at the agency location, or at an ALLSTATE facility (usually following one of the newly instituted mandatory training sessions);

h)   ALLSTATE requiring the Allstate Agency Owners to purchase/use particular furniture (including where it must be placed in the office), as well as the particular paint.

i)   ALLSTATE requiring Agencies to inspect vehicles and obtain completed documents from customers whose business was written by the CIC (i.e. the ALLSTATE call center) even though the Agency Owners would not receive a commission or any other compensation for this work.

j)   ALLSTATE requiring both the Agency Owners and their employees to complete the WOOPLE training, which covered standardized sales techniques and approaches for selling insurance policies to prospective and existing clients using the ALLSTATE system instead of the Agency Owners' individual sales methods or approaches.

k)   ALLSTATE requiring the Agency Owners to buy and use ALLSTATE's proprietary software system, for which ALLSTATE charged the Agency Owners $75.00 per month per computer, as well as required the Agency Owners to buy and use specific computer and computer related hardware (e.g. printers, IBM monitors, keyboard, etc.)

l)   Allstate requiring the Agency Owners to do home re-inspections on non-renewals.

m)   ALLSTATE requiring the Agency Owners to fax them trailing documents on every new policy written;

n)   ALLSTATE secretly monitoring the e-mail accounts of ALLSTATE customers and notifying Agency Owners by e-mail when any of their customers were shopping

45

insurance on the Internet, and ALLSTATE requiring Agency Owners to contact those customers within 24 hours of that e-mail notice, and specifically instructing Agency Owners not to disclose that ALLSTATE was aware the customer was shopping for new insurance;

o)     ALLSTATE managers regularly and routinely coming to the Allstate Agency Owners' offices and sitting in to listen and monitor interaction between the agency staff/employees and customers in order to insure that the staff/employee was properly employing the methods dictated by ALLSTATE.

90.     Plaintiffs and the Plaintiff Class have fully performed all conditions, covenants, and promises to be performed on the part of Plaintiffs and the Plaintiff Class under the contract, or they have been excused from having to do those things.

91.     As a proximate result of the breach of the contract by ALLSTATE, as herein alleged, Plaintiffs and the Plaintiff Class have been damaged in that ALLSTATE's breach has reduced the value of their respective books of business, and that they have incurred substantial expenses running their respective supposedly independent agencies which they would not have agreed to incur as part of the R3001 if ALLSTATE had not promised to treat them as true Independent Contractors as specified in the R3001, such that when ALLSTATE breached the contract by not treating the Plaintiffs and the Plaintiff Class as independent contractors, the Plaintiffs and the Plaintiff Class have all suffered damages in that they incurred and paid expenses to run their agencies when those agencies were not truly independent and those expenses should have been paid by ALLSTATE, all in an amount to be proven at time of trial.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF BUSINESS & PROFESSIONS CODE § 17200 ET SEQ.

### (All Plaintiffs and the Entire Plaintiff Class against All Defendants)

92.     Plaintiffs and the Plaintiff Class hereby reincorporate by reference all the allegations in paragraphs 1 though 91 as if they were set forth in full in this paragraph.

93.     Plaintiffs and the Plaintiff class is informed and believes that ALLSTATE's conduct and actions as described in this TAC were unlawful, unfair, and deceptive business acts and practices,

46

and thus in violation of California Business and Professions Code § 17200, *et seq.*, including but not limited to: misclassifying Plaintiffs and the proposed Plaintiffs' Class as independent contractors in violation of the California Labor Code as Plaintiffs and the proposed Plaintiffs' Class were so controlled and dominated by ALLSTATE that they were actually employees of ALLSTATE, and by failing to reimburse the Plaintiffs and the proposed Plaintiffs' Class for their expenditures incurred as employees of ALLSTATE within the four years prior to the filing of this Action on September 1, 2011 until the present in violation of California Labor Code §2802.

94.     By reason of ALLSTATE's unlawful, unfair, and deceptive conduct as described throughout this TAC, ALLSTATE has reaped unfair benefits and taken property at the expense of and from Plaintiffs and the Plaintiff Class.  Defendants are therefore liable to pay restitution and other equitable relief pursuant to California Business and Professions Code § 17203.  All such remedies are cumulative of relief available under other laws pursuant to California Business and Professions Code § 17205.

95.     Plaintiffs and the Plaintiff Class are further entitled to, and do seek, injunctive relief restraining ALLSTATE from engaging in any of the misconduct alleged in this TAC.

96.     Plaintiffs and the Plaintiff Class request attorney's fees and costs pursuant to California Code of Civil Procedure §1021.5 as this action is brought to vindicate rights of a large class.

## CLASS-ACTION ALLEGATIONS

97.     Plaintiffs bring this action on their own behalf and as a class-action on behalf of all persons and entities similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed class that Plaintiffs seek to represent is composed of all other persons and entities who are, or were within the last four years prior to the filing of this Action (i.e. September 1, 2011), operating in California as owners of Allstate Insurance Agencies, which are further subdivided into three sub-classes: the first sub-class being comprised of those class members that are no longer owners of Allstate insurance agencies (i.e. those Plaintiffs and their similarly situated Class members that did own an Allstate insurance agency in California within the period beginning four years from the date this action was first filed, but have since sold their insurance agencies) and had potential buyers of their books of business affirmatively rejected by ALLSTATE; the second sub-class being comprised

THIRD AMENDED COMPLAINT

of those class members that are no longer owners of Allstate insurance agencies that had a prospective buyer for their respective book of business waiting in the wings but did not submit the prospective buyer because of ALLSTATE informed them that it would not consider in good faith any proposed buyers that they submitted; and the third sub-class being comprised of those persons/entities that continue to own an Allstate insurance agency in California. Excluded from the class are current owners of Allstate insurance agencies in California that are also family members (e.g. husbands, wives, brothers, sisters, nieces and nephews) of the current managers, officers and directors of ALLSTATE.

98.     The persons/entities in the class, as well as in each of the sub-classes, are so numerous, consisting of approximately over 1000 in total with well over a hundred in each of the two sub-classes, that the joinder of all such persons/entities is impracticable and that the disposition of their claims in a class-action rather than in individual actions will benefit the parties and the court.

99.     There is a well-defined community of interest in the questions of law and fact involved in this case and affecting the Plaintiff Class. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members including, but not limited to:

      a.  ALLSTATE has a uniform, written contract, as amended from time-to-time, between it and all of the Class members;

      b.  whether the contract between ALLSTATE and the Class members allows ALLSTATE to use a performance based program as a mechanism to terminate a Class members of contractual rights as an Allstate insurance agency owner;

      c.  whether ALLSTATE used a performance based program as a mechanism to terminate Class members of their contractual rights as Allstate insurance agency owners;

      d.  whether ALLSTATE's use of a performance based program as a mechanism to terminate Class members of their contractual rights as Allstate insurance agency owners is a breach of the written contract between ALLSTATE and the Class members;

THIRD AMENDED COMPLAINT

e.  whether ALLSTATE's use of a performance based program as a mechanism to terminate Class members of their contractual rights as Allstate insurance agency owners is a breach of the implied covenant of good faith and fair dealing of the written contract between ALLSTATE and the Class members;

f.  whether ALLSTATE's use of a performance based program as a mechanism to terminate Class members of their contractual rights as Allstate insurance agency owners was a pretext to disguise the true reasons why ALLSTATE was terminating its contracts with Class members and depriving them of their contractual rights as Allstate agency owners;

g.  whether ALLSTATE's conduct and actions within four years from the filing of this Action as alleged in the TAC were uniform across in the manner in which it regulated and managed the Class members;

h.  whether ALLSTATE's conduct and actions within four years from the filing of this Action in the way it regulated and managed the Class members as alleged in the TAC establish an independent contractor relationship or an employment relationship between the Class members, on the one hand, and ALLSTATE, on the other hand;

i.  whether ALLSTATE's conduct and actions within four years from the filing of this Action in the way it regulated and managed the Class members as alleged in the TAC established an employment relationship between the Class members, on the one hand, and ALLSTATE, on the other hand, and as such constituted a breach by ALLSTATE of the implied covenant of good faith and fair dealing;

j.  whether under the terms of the written contract ALLSTATE had absolute and unfettered discretion to approve or reject any proposed buyer of a Class member's Allstate insurance agency;

k.  whether a provision in the written contract stating that ALLSTATE has exclusive judgment to approve or disapprove potential buyers proposed by Allstate Agency Owners, does or does not give ALLSTATE the right to refrain from fairly

49

considering all potential buyers;

l. whether ALLSTATE is, and was, legally required to consider, in good faith, the qualifications of each proposed buyer on his or her own merits when it exercised its exclusive judgment in deciding whether to accept or reject buyers proposed by one of the Class members;

m. whether the Class members are entitled to an injunction preventing ALLSTATE from refusing to consider, in good faith, the qualifications of each proposed buyer on his or her own merits when it exercised its exclusive judgment in deciding whether to accept or reject buyers proposed by one of the Class members;

n. whether the Class members are entitled to an injunction preventing ALLSTATE from using a performance based mechanism to terminate Class members' contractual rights as Allstate insurance agency owners;

o. whether the Class members are entitled to an injunction preventing ALLSTATE from continuing to regulate and manage the Class members' businesses, as alleged in the SAC, so that the Class members can once again operate their businesses as independent contractors/business owners and not be treated by ALLSTATE as essentially employees;

p. whether Class members that submitted potential buyers to ALLSTATE for approval had prospective economic relationships with those potential buyers;

q. whether ALLSTATE had a practice of rejecting qualified buyers submitted by Class members without a good faith basis for doing so;

r. whether ALLSTATE's practice of rejecting qualified buyers submitted by Class members without a good faith basis for doing so wrongfully interfered with the Class members' prospective economic relationships with those potential buyers;

s. whether ALLSTATE's practice of rejecting qualified buyers submitted by Class members without a good faith basis for doing so was independently actionable conduct;

t. whether Class members had prospective economic relationships with their

THIRD AMENDED COMPLAINT

1     insurance customers/clients;

2     u.  whether ALLSTATE's actions as alleged in the TAC interfered with the Class

3          members prospective economic relationships with their insurance customers/clients;

4     v.  whether ALLSTATE's actions as alleged in the TAC that interfered with the Class

5          members prospective economic relationships with their insurance customers/clients

6          was independently actionable conduct;

7     w.  whether ALLSTATE's allegedly wrongful actions, taken as a whole, constitute a

8          violation of California Business & Profession Code § 17200 *et seq.* as unfair,

9          fraudulent or unlawful business practices;

10    x.  the extent of the damages suffered by members of each sub-class and the

11         appropriate measure of damages.

12  Proof of a common state of facts will establish the right of each Plaintiff Class member of the Class to

13  recover damages, as well as their entitlement to the same injunctive relief, thus, the questions of law

14  and fact on these common issues predominates over questions that affect only individual class

15  members.

16       100.   The claims of Plaintiffs are typical of those of the Class as all of the named Plaintiffs

17  are/were longstanding Allstate Agency Owners operating Allstate insurance agencies and the named

18  Plaintiffs and the Class are/were all similarly impacted by the uniform, wrongful conduct by

19  ALLSTATE as alleged throughout the SAC, which give rise to the named Plaintiffs' claims in the

20  SAC, and which are typical of the claims that the other Class members have against ALLSTATE. In

21  addition, the named Plaintiffs operated their various Allstate insurance agencies throughout California,

22  including geographically located in northern, southern and eastern California.

23       101.   The Plaintiffs are all current or (have within the last four years become) former

24  Allstate insurance agency owners, and they are each highly respected throughout the Class

25  membership (i.e. they are highly respected by the other Allstate agency owners in California), and they

26  will fairly and adequately represent the interests of, and participate in the prosecution of, this case for

27  themselves and for the benefit of the entire Class. And Plaintiffs have no interests which conflict with

28  those of the Class.

51

THIRD AMENDED COMPLAINT

102.   This action is brought by two law firms with a total of five lawyers, and the two co-lead counsel Mark J. Butler and Michael J. Buley have the necessary experience to adequately represent the Class and prosecute this action.  Mr. Butler has been involved in multiple class-actions over the past 10 years representing both plaintiffs and defendants, and has been one of the lead attorneys responsible for successfully having several class-actions certified as such on the plaintiffs' side.  Mr. Buley is a civil litigation trial attorney who has been trying cases in California for 18 years. He has tried between 25 and 30 matters to verdict/judgment.  These matters include bench trials (12 to 15); jury trials (7); and single- and multi-panel binding arbitrations (7 to 10). Mr. Buley is one of the few attorneys practicing to actually have tried cases to verdict in matters designated as complex.  Over the last three years, he has tried two complicated business litigation matters to juries and obtained judgments in favor of his clients in both instances.  Last year he successfully tried two matters in Arizona as lead counsel after being admitted *pro hac vice*.  He has also successfully tried multiple cases to verdict where the main cause of action was breach of the implied covenant of good faith and fair dealing.

103.   The Class will be easily ascertainable, as ALLSTATE undoubtedly knows the identities of all of the Class members, so the exact Class will be ascertainable.  In addition, ALLSTATE undoubtedly has good contact information for the vast majority of (if not all) of the former Allstate agency owners, and has the exact contact information for the Class members that are current Allstate agency owners.

104.   This class action qualifies as such under FRCP 23(b)(1)(A) and (B), FRCP 23(b)(2), and FRCP 23(b)(3) as the grounds for certification of this matter as a class action are, among other things, that (a) there is no plain, speedy, or adequate remedy other than by maintenance of this class action since the prosecution of individual remedies by members of the Class would tend to establish inconsistent standards of conduct for ALLSTATE and tend to result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties, (b) this action is brought as a class action seeking injunctive relief, which must be uniform for the Class, and (c) because the common questions of law and fact (as shown above) predominate over any questions affecting only individual Class members, a class action is the superior method for the fair

THIRD AMENDED COMPLAINT

and efficient adjudication of this controversy.

105.    Following certification of the matter as a class action, Plaintiffs' propose an "opt-out" written notice to be mailed to all Class members at their last known address.  The notice shall contain a brief explanation of the lawsuit, and include as an attachment a copy of the then operative complaint and explain both the potential benefits of remaining in the Class, as well as the effect of res judicata and its impact on any claims the individual Class members may have against ALLSTATE.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and collectively pray as follows with regard to each of the above causes of action which may be asserted by one or more of the various Plaintiffs and the members of the Plaintiff Class:

### AS TO THE FIRST CAUSE OF ACTION:

1.    For compensatory damages according to proof at time of trial, but in no event less than $500,000,000;

2.    For interest as allowed by law; and

3.    For cost of suit herein.

### AS TO THE SECOND CAUSE OF ACTION:

1.    For compensatory damages according to proof at time of trial, but in no event less than $500,000,000;

2.    For interest as allowed by law; and

3.    For cost of suit herein.

### AS TO THE THIRD CAUSE OF ACTION:

1.    For a declaration that the business acts and practices described in this TAC are unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code § 17200 *et seq.*;

THIRD AMENDED COMPLAINT

2. For injunctive relief restraining ALLSTATE from engaging in any of the misconduct alleged in this TAC;

3. For restitution of all property taken from Plaintiffs and the Plaintiff class by ALLSTATE from September 1, 2007 to the present, in an amount to be proven at trial; and

4. For costs of suit herein.

<u>AS TO ALL CAUSES OF ACTION</u>:

1. For attorneys' fees as applicable pursuant to CCP §1021.5;

2. For costs of suit incurred herein; and

3. For such other and further relief as the court deems just and proper.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs and the proposed Plaintiffs' Class hereby demand a jury trial on their First and Second Causes of Action, and request an advisory jury on their Third Causes of Action.

Dated: September 24, 2012

MARK BUTLER & ASSOCIATES

By: _____
Mark J. Butler
Attorney for Plaintiffs and the
Proposed Class

THIRD AMENDED COMPLAINT

## PROOF OF SERVICE

1
2
3        I am employed in the County of Orange, State of California.  I am over the age of eighteen
4    years and not a party to the within action.  My business address is 1103 Quail Street, Newport Beach,
     California 92660.
5
6        On September 24, 2012, I served a true copy of the foregoing document described as **THIRD
     AMENDED COMPLAINT,** in this action as follows:
7
                              ### SEE ATTACHED SERVICE LIST
8
9    ☒      **BY MAIL:**  By placing a true copy thereof enclosed in a sealed envelope
            addressed as above, with postage thereon fully prepaid in the United States mail,
10          at Newport Beach, California.  I am readily familiar with the firm's practice of
            collection and processing correspondence for mailing.  Under that practice it
11          would be deposited with U.S. Postal service on the same day with postage
            thereon fully prepaid at Newport Beach, California, in the ordinary course of
12          business.  I am aware that on motion of the party served, service is presumed
            invalid if postal cancellation date or postage meter date is more than one day
13          after date of deposit for mailing in affidavit.

14    ☐      **BY OVERNIGHT COURIER:**  I caused the above-referenced document to be
            delivered to _____ for delivery to the above address.
15
      ☐      **BY FAX:**  I transmitted a copy of the foregoing documents(s) this date via
16          telecopier to the facsimile number shown above.

17    ☐      **BY PERSONAL SERVICE:**  I caused such envelope to be delivered by hand
            to the addressee.
18
      ☐      [State]   I declare under penalty of perjury under the laws of the State of
19          California that the foregoing is true and correct.

20    ☒      [Federal]  I declare that I am employed in the office of a member of the bar of
            this court at whose direction the service was made.
21
     Executed on September 24, 2012, at Newport Beach, California.
22
23                                                        _M. Kathleen Milhone_
24                                                        M. Kathleen Milhone
25
26
27
28

P022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SERVICE LIST

Gary McLaughlin, Esq.
Timothy Del Castillo, Esq.
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
*gmclaughlin@akingump.com*
*tdelcastillo@akingump.com*