**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Andrea Keifer | | Not Reported |
| Deputy Clerk | | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (DKT. 90)**

**I.     Introduction**

This action arises out of the Exclusive Agency Agreements (the "Agreements") entered into in 1996 by Allstate Insurance Company ("Defendant" or "Allstate") and its California-based insurance agents. The Agreements expressly converted Allstate agents from employees to independent contractors. Dkt. 72, ¶ 27. Plaintiffs are current or former insurance agents who sold Allstate insurance policies under the Agreements during the period between 2008 and 2013. Dkt. 90-1, p. 2. Plaintiffs contend that, beginning in 2008, Defendant breached the Agreements by denying in bad faith the approval of Plaintiffs' proposed sales of their agencies to potential buyers, and exercising extensive control over their agencies, rendering them de facto employees. As a result, Plaintiffs contend their agencies declined in value, and they became entitled to reimbursement for business expenses. Dkt. 72, ¶ 91.

Plaintiffs filed the Third Amended Complaint ("TAC") on September 24, 2012. Dkt. 74.[1] The TAC advances three causes of action: (i) Breach of the Implied Covenant of Good Faith and Fair Dealing; (ii) Breach of Written Contract; and (iii) Violation of Cal. Bus. & Prof. Code § 17200 et seq. Plaintiffs seek compensatory damages, restitution, injunctive relief, interest, attorneys' fees and costs. Dkt. 72, pp. 53-54. On May 17, 2013, Plaintiffs filed a Motion for Class Certification (the "Motion") with respect to the

---

1 Juan Comparetto ("Comparetto"), one of 20 named Plaintiffs, originally filed this action in the Los Angeles County Superior Court on September 1, 2011. Dkt. 1. The original complaint advanced eight causes of action against Defendant and five individuals (Robert H. Barge, III; Barbara Larkin; Timothy Larkin; Heidi Palmer; and Brad Palmer). Notice of Removal, Exh. B, Dkt. 1. The case was removed on November 4, 2011. *Id.* On December 12, 2011, Plaintiffs filed their First Amended Complaint ("FAC"), which excluded the individual defendants, thereby making Allstate the sole defendant. Dkt. 29. Defendant moved to dismiss the FAC on January 13, 2012 (Dkt. 36), and on April 23, 2012 the Court granted the motion, in part with, and in part without, leave to amend. Dkt. 53. Plaintiffs filed their Second Amended Complaint ("SAC") on May 8, 2012. Dkt. 57. Defendant moved to dismiss the SAC on June 1, 2012 (Dkt. 60), and on August 22, 2012 the Court granted the motion in part, with leave to amend certain claims. Dkt. 69.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

second and third causes of action. Dkt. 90.2. Dkt. 72, ¶ 91. On November 18, 2013, the Court heard oral argument on the Motion, and took the matter under submission. Dkt. 113. For the reasons set forth in this Order, the Motion is DENIED.

II.     **Factual Background**

In 1996, Allstate converted its California-based insurance agents from employees to independent contractors. Dkt. 72, ¶ 26. The terms of the relationship between Allstate and the independent contractor agents were set forth in one of three versions of the Agreements: (i) R3001, between Allstate and individual agents; (ii) R3001S, between Allstate and sole proprietorships; and (iii) R3001C, between Allstate and corporations, or LLCs. Dkt. 92, p. 2. Each of the agreements expressly states that an agent is an "independent contractor for all purposes." Dkt. 90-26, Exh. A, Sec. I(B) (R3001 Agreement); Dkt. 90-27, Exh. B, Sec. I(D) (R3001S Agreement); Dkt. 90-29, Exh. D, Sec. I(D) (R3001C Agreement). The R3001 and R3001S agreements also provide that agents "will have full control of [their] time and the right to exercise independent judgment as to the time, place, and manner of performing [their] duties" under the agreement. Dkt. 90-26, Exh. A, Sec. I(B); Dkt. 90-27, Exh. B, Sec. I(D).3 The Agreements require agents to pay their own business expenses. Dkt. 90-26, Exh. A, Sec. VIII; Dkt. 90-27, Exh. B, Sec. VIII; Dkt. 90-29, Exh. D, Sec. VIII.

The Agreements establish "Duties and Conditions," including that agents "will provide customer service, including the collection of payments, for any and all Company policyholders and . . . will assist in claims administration." Dkt. 90-26, Exh. A, Sec. II; Dkt. 90-27, Exh. B, Sec. II; Dkt. 90-29, Exh. D, Sec. II. Two of the three agreements (R3001S and R3001C) set forth additional duties for agents operating as sole proprietorships, corporations or LLCs:

> [Agents] will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. [Agents] will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

Dkt. 90-27, Exh. B, Sec. II(B); Dkt. 90-29, Exh. D, Sec. II(B).

The parties agree that, from 1996 until 2008, agents operating under the Agreements were appropriately classified as independent contractors. Dkt. 72, ¶¶ 38, 64; Dkt. 90, p. 5; Dkt. 92, p. 3. However, Plaintiffs allege that, in 2008, Allstate began "micro-managing" them through a number of policies and practices. Dkt. 72, ¶¶ 65, 89. They allege that the "cumulative effect" of the 2008 and the pre-2008 policies and

---

2  Plaintiffs agreed not to seek certification of the first cause of action, which is based on Defendant's alleged bad faith denial of potential buyers for Plaintiffs' agencies. Dkt. 90, p. 4, n.2.
3  The R3001 Agreement refers to the agents' duties "under this Agreement," whereas the R3001S agreement refers to the duties "which are defined in this Agreement and the incorporated Supplement, EA Manual, and Agency Standards. Dkt. 90-26, Exh. A, Sec. I(B); Dkt. 90-27, Exh. B, Sec. I(D).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

practices was to convert agents from independent contractors into de facto employees. In the Motion, Plaintiffs highlight the following as the five most significant such policies and practices:

1. Allstate implemented "extremely difficult and ever increasing sales quotas," that required agents "to sell huge and ever increasing numbers of extremely hard to sell Life insurance and . . . economically disastrous 'Emerging Business' policies," under the threat of termination (Dkt. 90, pp. 5-6);

2. Allstate "took control of the agency staff through mandatory, Allstate-run training . . . that dictated the means the staff used for performing even the most basic functions/duties" (*Id.* at 6);

3. Allstate required the agents "to perform services for large numbers of Allstate corporate customers without compensation" (*Id.*);

4. Allstate "assign[ed] individual tasks to the . . . [a]gents and monitor[ed] the agency staff" (*Id.*);

5. Allstate instituted a "'mystery shopper' program whereby a person on a recorded line would call the agencies pretending to be shopping for insurance while recording the interaction and then giving a written report to the [agent] scoring the staff's performance in following Allstate sales methods and scripted talking points" (*Id.*).

In the TAC, Plaintiffs highlight these five practices and policies, and also make allegations about several other post-2007 policies and practices. These include increased communication between Allstate management and agents' employees, and requiring agents to use Allstate software, fax Allstate "trailing documents" on new policies, conduct "home re-inspections on non-renewals," and contact customers whom Allstate had identified as shopping for insurance online. Dkt. 72, ¶ 89.

Plaintiffs sold their individual agencies at different times between 2008 and 2013. Dkt 72, ¶¶ 50-63. They contend that they received lower prices for their agencies due to Allstate's alleged micro-management. *Id*. They seek to certify a class of "all persons operating an insurance agency within the state of California pursuant to an R3001, R3001C, or R3001S Exclusive Agency Agreement with Allstate at any time from September 1, 2007 until the time when class notice may be given, and certifying Plaintiffs as class representatives and their counsel of record herein as counsel for the Plaintiff Class." Dkt. 90, p. 4. In their reply, Plaintiffs "concede that R3001 Agents who left Allstate before 2008 should not be part of the class since the practices at issue started in 2008." Dkt. 94, p. 9.

**III.    Analysis**

    **A.    Legal Standards**

        1.    <u>Fed. R. Civ. P. 23</u>

"The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *United Steel Workers v. ConocoPhillips*, 593 F.3d 802, 807 (9th Cir. 2010). Rule 23(a) provides that "[o]ne or more members of a class may sue or be sued as representative parties on

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

Rule 23(b)(3) states that, to certify a class, a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Four factors pertinent to the superiority of a class action are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "[S]ometimes it may be necessary for the court to probe behind the pleadings," and conduct a "rigorous analysis" to determine whether "the prerequisites of Rule 23(a) have been satisfied." *Id.* (internal citations omitted). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 2551-52 (internal citations omitted).

> 2. <u>Employees vs. Independent Contractors</u>

Under California law, "the principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341, 350 (1989) (emphasis added). The actual control exercised is relevant to that determination, because "the control that is actually exercised may be informative of the control that may be exercised." *Harris v. Vector Mktg. Corp.*, 753 F. Supp.2d 996, 1021 (C.D. Cal. 2010) (citing *Toyota Motor Sales U.S.A. v. Super. Ct.*, 220 Cal. App.3d 864, 875 (1990)). However, actual control is merely one form of potential evidence of the right to control; it is not required in order to determine the nature of an employment relationship. "California law does not insist on actual control. Under California law, 'it is the right to control, not the exercise of the right, which bears on the status of the work arrangement.'" *In re Carter*, 182 F.3d 1027, 1031 (9th Cir. 1999) (quoting *Borello*, 48 Cal.3d at 357 n.9); *Greenaway v. Workmen's Comp. Appeals Bd.*, 269 Cal. App.2d 49, 55 (1969) ("[I]t is the principal's right to exercise control, and not necessarily the exercise of that right, which determines whether the person performing the service is an employee or an independent contractor.").

The California Supreme Court has recognized "several secondary indicia of the nature of a service relationship . . . derived principally from the Restatement Second of Agency." *Borello,* 48 Cal.3d at 351. The secondary factors are:

> (a) whether the one performing services is engaged in a distinct occupation

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.* These secondary factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Id.* at 404.

    **B.**    **Application**

        1.    <u>Adequacy, Typicality, and Numerosity</u>

Plaintiffs have shown that the requirements of adequacy, typicality, and numerosity are met. Indeed, Defendant concedes that Plaintiffs have satisfied these three requirements. Dkt. 92. With respect to numerosity, the approximate number of agents operating under the Agreements between 2008 and 2013 is at least 1,300. Dkt. 90, p. 8 (citing Buley Decl., Exh. B). Typicality has been shown because Plaintiffs' claims arise under the same agreements, are based on the same legal theory, and give rise to the same remedies as those of the putative class. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (characterizing the typicality requirement as "permissive," and holding that the representatives' claims "need not be substantially identical," but rather must be "reasonably co-extensive" with absent class members). Finally, adequacy has been shown because Plaintiffs' counsel have submitted declarations stating that they do not have a conflict of interest with other class members, and have demonstrated that they are "vigorously" prosecuting the action on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

        2.    <u>Commonality</u>

Defendant contends that Plaintiffs have failed to show commonality under Rule 23(a)(2). Dkt. 92, p. 6. "What matters to class certification is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (internal citations omitted) (emphasis in original). However, unlike Rule 23(b)(3), which is discussed below, Rule 23(a)(2) does not require that common issues predominate. To the contrary, "for purposes of Rule 23(a)(2) even a single common question will do." *Id.* (internal citations omitted). Moreover, in the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Staton*, 327 F.3d at 953; *Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3).").

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

Defendant contends that Plaintiffs have failed to demonstrate commonality, because the "ultimate question . . . whether each Plaintiff and class member was treated as an employee rather than an independent contractor," requires individualized determinations. Dkt. 92, p. 6. However, under Rule 23(a)(2), Plaintiffs need not show that the "ultimate" question is a common one; they need only show that at least one question is common. Plaintiffs have shown that common evidence and analysis will largely determine the scope of Allstate's authority to supervise and control agents under the Agreements. Thus, all members of the putative class signed the Agreements, and each of the Agreements expressly provides that the agents are independent contractors. Dkt. 90-26, Exh. A; Dkt. 90-27, Exh. B; Dkt. 90-29, Exh. D. The presence of this common question is sufficient to satisfy Rule 23(a)(2).

    **C.**    **Fed. R. Civ. P. 23(b)(3)**

        1.    <u>Predominance of Common Questions</u>

"[T]he presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1022. The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have [sic] been established pursuant to Rule 23(a)(2)." *Id.* Rule 23(b)(3) "focuses on the relationship between the common and individual issues," to determine whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Id.* (internal citations omitted). The "main concern in the predominance inquiry . . . [is] the balance between individual and common issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009).

Plaintiffs contend that the scope of the Agreements, whether Allstate breached the Agreements and converted the agents into employees, and the appropriate, resulting remedies, are all common issues. Dkt. 90, pp. 12-18. Defendant concedes that the content of the Agreements is a common issue. Dkt. 92, p. 2. Defendant contends, however, that whether Allstate breached the Agreements is an individualized question. Dkt. 92, p. 13. As noted, Plaintiffs contend that, beginning in 2008, Allstate instituted five new policies or practices, and that the "cumulative effect" of those policies and practices and the pre-existing policies and practices was to convert the agents from independent contractors into de facto employees. Dkt. 90, p. 13. Each of the five policies or practices is separately addressed.

            a)    Setting Coercive Sales Targets

Plaintiffs contend that, although Allstate had previously set sales targets, known as "Expected Results," in 2008, Allstate increased "what had previously been reasonable minimum sales requirements, into extremely difficult and ever increasing sales quotas enforced by threat" of termination. Dkt. 90, p. 5. Specifically, Plaintiffs contend that Allstate used the Resource for Growth ("RFG") program to require agents to sell "huge and ever increasing numbers of extremely hard to sell Life insurance and – for the R3001 Agents – economically disastrous 'Emerging Business' policies." *Id.* at 3. Plaintiffs contend that, as a result, there is a common question: "whether the manner in which Allstate changed the RFG in 2008 forward under threat of termination if the sales quotas were not met had the coercive effect to force the class members to direct their agency resources (i.e. both financial and staff) in a way that the class members would not otherwise have done." *Id.* at 9. Defendant concedes that it established sales targets for all class members through the "Expected Results" system. Dkt. 92, p. 12. However, Defendant contends that whether the targets were coercive requires individualized inquiries, given that different

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

agencies were given different targets, and some agents declared that they were not coerced by the targets. *Id.* at 12.

In the Motion, Plaintiffs do not contend that the establishment of sales targets alone constitutes control over the manner and means by which agents run their agencies. Indeed, the principal test under *Borello* is not whether Allstate established a desired result, but whether Allstate "has the right to control the manner and means of accomplishing the result desired." *Borello* 48 Cal.3d at 350; *Greenaway*, 269 Cal. App.2d at 54 (recognizing that "independent contractor" is defined under the California Labor Code as a person who "renders service for a specific recompense *for a specified result* . . .) (emphasis added). Rather, the question that Plaintiffs propose is common to the class is whether the sales targets had "the coercive effect to force the class members to direct their agency resources" in a particular way. Dkt. 90, p. 9. Plaintiffs contend that the targets did have such an effect. In support of their position, Plaintiffs cite to their own individual experiences, declaring that they had to allocate staff and resources in a particular way in order to meet the targets established by RFG. *See* Pls. Decls., Dkts. 90-4 – 90-19.

Plaintiffs do not provide evidence sufficient to demonstrate that their respective experiences are consistent with those of all, or even a substantial number, of the putative class members. Defendant submits declarations from several putative class members who state that they "never paid close attention" to the targets, because their own goals exceeded the targets. Dkt. 92-17, Exh. 2, Domenick Decl., ¶ 16 ("I have never paid close attention to Allstate's performance expectations because they are quite reasonable and easily attainable."); Dkt. 92-17, Exh. 1, Bryan Decl., ¶ 12; Dkt. 92-17, Exh. 3, Hutchison Decl., ¶ 11; Dkt. 92-17, Exh. 5, Soell Decl., ¶ 23; Dkt. 92-17, Exh. 7, Chandler Decl., ¶ 23. Moreover, Defendant submits evidence that individual agencies' sales targets varied depending on their size, and how long they had been operating. *See* Dkt. 92-17, Exh. 5, Soell Decl., ¶ 23; Dkt. 92-13, Collins Decl., p. 2. Plaintiffs' proposed question -- whether the sales targets "had the coercive effect to force the class members to direct their agency resources" in a particular way -- is inherently one that calls for individualized determinations. Although Plaintiffs were in a position to gather evidence to support the contention that all, or a substantial number, of class members were similarly coerced, they have not done so. In contrast, Defendant has provided evidence that supports its claim that at least some putative class members were not coerced. For these reasons, Plaintiffs have not met their burden to show that the question, whether class members were coerced into allocating their business resources in a particular way in the operation of their respective agencies, is common to the class.4

At the hearing on the Motion, Plaintiffs argued that, because RFG required agents to sell particular policies -- specifically renter's insurance and life insurance -- the sales targets themselves reflected more than a desired result. Thus, they argue that such targets effected control by Allstate over the manner and means by which they operated their agencies. However, Plaintiffs have not shown that RFG set such narrow requirements. To the contrary, John Edwards, an Allstate California senior manager, testified that, although renter's insurance was the policy most often sold within the Emerging Business component of RFG, other Emerging Business policies included mobile homes, ski-doos, toys, Recreational Vehicles,

---

4 In their Reply, Plaintiffs state that Defendant acknowledged that "Allstate implemented [sales targets] requiring . . . Agents to achieve specific numbers of Emerging Business policies commencing in about 2008." Dkt. 94, p. 5. However, as noted above, whether Allstate established sales targets is not the primary question as expressly stated by Plaintiffs in their Motion: whether the targets had a coercive effect.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

and "stuff like that." Dkt. 90-20, Edwards Depo., p. 150. Allstate submitted evidence that additional Emerging Business policies included "boat, motorcycle . . . umbrella policies," (Dkt. 92-17, Exh. 3, Hutchison Decl., ¶ 11) as well as condominium insurance policies. Dkt. 92-17, Exh. 1, Bryan Decl., ¶ 12; Dkt. 92-17, Exh. 6, Curtis Decl., ¶ 24.

Further, although Plaintiffs contend that, under RFG, agents were required to sell "huge and ever increasing numbers of extremely hard to sell Life insurance," the evidence submitted by Plaintiffs shows that RFG measured the sale not of life insurance specifically, but of "Allstate Financial" products. Dkt. 90-21, p. 17. Plaintiffs have not provided evidence to show that "Allstate Financial" refers exclusively to life insurance. By contrast, Defendant has submitted evidence that "Allstate Financial" includes "long-term care, annuities, mutual funds and disability insurance." Dkt. 92-17, Exh. 3, Hutchison Decl., ¶ 11; Dkt. 92-17, Exh. 4, Navarro Decl., ¶ 9. For these reasons, Plaintiffs have not shown that the sales targets were set so narrowly that they controlled the manner and means by which agents operated their agencies.

        b)      Servicing Corporate Customers

Plaintiffs also contend that a common question is "whether Allstate forced the R3001 Agents to perform services for Allstate corporate customers without compensation." Dkt. 90, p. 10. Defendant concedes that its policy required agents to service corporate customers when requested to do so by the company. Dkt. 92, pp. 15-16. However, Defendant contends that the extent to which that policy controlled the agents is an individualized question, because agencies "differ widely in the amount of 'corporate customers' [they] were asked to service and how much time it took." *Id.* at 16.

Here, Plaintiffs must establish that the policy existed, not that it was exercised in a coercive manner. Although the extent to which the policy was exercised to control agents is relevant evidence of its existence, Defendant admits the existence of the policy. *Toyota Motor Sales*, 220 Cal. App.3d at 875. Therefore, actual control need not be shown. *In re Carter*, 182 F.3d at 1031. Instead, Plaintiffs must show that Allstate had a policy of requiring agents to service corporate clients. That is a question to which Allstate concedes that there is a common answer.

However, that does not end the inquiry. The existence of the policy is only relevant to the second cause of action if the policy contributes to a violation of the Agreements. Whether it so contributes depends, in part, on the express terms of the Agreements. Although the Agreements are very similar in many areas, they differ on this question. Thus, the R3001S and R3001C agreements expressly state that agents will "service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy," whereas the R3001 agreement contains no such requirement. Dkt. 90-26, Exh. A; Dkt. 90-27, Exh. B, Sec. II(B); Dkt. 90-29, Exh. D, Sec. II(B). The question whether the policy breached the R3001S and R3001C agreements may require different analysis than the question whether it breached the R3001 agreement. Therefore, there is not a common issue under the second cause of action with respect to whether this policy breached the agreements.

        c)      Assigning Daily Tasks

Plaintiffs contend that, beginning in 2008, Allstate assigned "individual tasks to the R3001 Agents and

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

monitor[ed] the agency staff through Allstate's mandated Impact computer system to insure [sic] that the tasks were completed in a timely and proper manner." Dkt. 90, p. 6. They contend that whether Allstate assigned such individual tasks and monitored completion of those tasks through the Impact computer system is a common question. *Id.* at 10. Defendant contends that the tasks assigned and monitored through the Impact system were optional. Dkt. 92, p. 18. Defendant states that, although some agents may have felt the tasks were mandatory, others did not, and therefore the "effect on controlling the manner and means of achieving results must have varied on an agent-by-agent basis." *Id.*

Although Plaintiffs contend that Allstate asserted the right, on a classwide basis, to assign mandatory tasks to agents, they have not provided evidence to support that claim. *Dukes*, 131 S. Ct. 2541, 2551 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule."). In contrast to its position as to RFG and the required servicing of corporate clients, Defendant does not concede that it asserted the right to assign mandatory tasks to agents. Defendant has submitted evidence that other putative class members did not believe that the tasks assigned to them through the Impact computer system were mandatory. Dkt. 92-17, Exh. 2, Domenick Decl., ¶ 21; Dkt. 92-17, Exh. 5, Soell Decl., ¶ 19; Dkt. 92-17, Exh. 6, Curtis Decl., ¶ 18; Dkt. 92-17, Exh. 8, Zaki Decl., ¶ 21. Plaintiffs offer no evidence to show that all class members were subject to the assignment of mandatory tasks. Instead, they provide only their own declarations stating that they believed the tasks assigned to them were mandatory. *See, e.g.,* Dkt. 90-6, Avila Decl., ¶ 7(e). Plaintiffs' declarations are insufficient to show that all, or a substantial number of, agents believed the tasks to be mandatory, and therefore to find that Allstate maintained a de facto, if not a formal policy, of issuing mandatory tasks to agents. For these reasons, Plaintiffs have not shown that this issue can be determined based on common evidence.

                        d)        Mystery Shopper Calls

Plaintiffs contend that Allstate "institut[ed] a 'mystery shopper' program whereby a person on a recorded line would call the agencies pretending to be shopping for insurance while recording the interaction and then giving a written report to the R3001 Agent scoring the staff's performance in following Allstate sales methods and scripted talking points." Dkt. 90, p. 16. Plaintiffs contend that whether Allstate instituted the mystery shopper program is a common question. *Id.* at 10. Allstate concedes that it operated the mystery shopper program, and conducted mystery shopper calls. Dkt. 92, pp. 18-19. However, Allstate contends that it "did not require agents to do anything with the feedback," and "[t]o the extent that any [agents] found mystery shopper calls to be coercive, this is a matter of individual interpretation." *Id.* at 19.

The proposed common question is not whether the practice coerced individual agents, but whether Allstate asserted the right, on a classwide basis, to conduct this program. That question can be answered with common evidence and analysis. Indeed, Defendant acknowledges that it conducted the calls. However, Plaintiffs have not shown that the answer to this common question will be significant to the determination of the action. Defendant submitted declarations from several agents, and deposition testimony from one of the named plaintiffs, stating that the mystery shopper calls ended after 2009. Dkt. 92-17, Exh. 1, Bryan Decl., ¶ 19; Dkt. 92-17, Exh. 3, Hutchison Decl., ¶ 23; Dkt. 92-17, Exh. 4, Navarro, Decl., ¶ 17; Dkt. 92-17, Exh. 5, Soell Decl., ¶ 20. Plaintiffs have not submitted specific evidence to show that the practice continued beyond 2009. Plaintiffs propose that the class include agents that operated "from as early as January 1, 2008 to at least January 1, 2013." Dkt. 94, p. 9. The evidence shows only that

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

the mystery shopper program was in place for two years out of the five-year proposed class period. For those agents who began operating after 2009, there is no evidence that they were subject to the mystery shopper program.

Further, Plaintiffs have not provided evidence to show that the mystery shopper program, even if implemented uniformly, was evidence of Allstate's assertion of a right to control the manner and means by which they operated their respective businesses. Thus, Plaintiffs do not contend that they were required to comply with new business policies or approaches based on the feedback they received, or that they suffered negative consequences as a result of receiving low scores. Instead, Plaintiffs state only that Allstate corporate managers would contact them or their employees when their agency "had not properly handled the mystery shopper calls as dictated by Allstate." Dkt. 90-4, Abdelnour Decl., p. 5; *see also* Dkts. 90-5 – 90-20. That Allstate asserted the right to provide feedback does not establish that it asserted the right to exercise control over the manner and means by which class members operated their business. *See Toyota Motor Sales*, 220 Cal. App.3d at 875 ("One of the means of ascertaining whether or not this right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed."). For these reasons, although the assertion of the right to conduct the mystery shopper calls is a common question, Plaintiffs have not shown that this common question will be significant to the determination of this action.

    e)  Mandatory Training

Plaintiffs contend that, beginning in 2008, Allstate asserted the right to conduct mandatory training sessions, at which agents' employees were taught mandatory sales techniques. Dkt. 90, p. 16. Plaintiffs contend that "whether Allstate increase [sic] training of agency staff members in the post-2008 period (both in-person and on-line) effectively dictated the means by which the R3001 staff performed their functions/duties" is a common question. *Id.* at 10. Defendant contends that the issue "cannot be common to all class members, however, because not all [agents] hired staff. . . . To the extent Plaintiffs allege that their staff members were presented with additional mandatory sales techniques at Allstate meetings, this was not true for all [agents]." Dkt. 92, p. 16.

The principal question under Rule 23(b)(3) is not whether all agents were controlled in the same manner by the allegedly mandatory training sessions, but whether all agents were subject to Allstate's asserted right to present mandatory sales techniques at such sessions. *Borello*, 48 Cal.3d at 350. That a particular agent did not have employees who were subject to the requirement, or did not receive mandatory sales techniques at particular training sessions, does not show that Allstate lacked the authority to conduct such training and impart such techniques. Plaintiffs have declared that they viewed attendance at the training sessions, and the sales techniques imparted at the trainings, as mandatory. Pls. Decls., Dkt. 90-5 – Dkt. 90-18.

Allstate concedes that it held mandatory training sessions, and it has submitted declarations in which agents state that they believed that the trainings were mandatory. *See* Domenick Decl., p. 5.Dkt. 92-17, Exh. 2. Although Allstate disputes whether mandatory sales techniques were presented at the trainings, a court does not "weigh the credibility of competing evidence" during a Rule 23 analysis. *Mad Rhino, Inc. v. Best Buy, Co.*, No. CV-03-5604, 2008 WL 8760854, at *2 (C.D. Cal., Jan. 14, 2008) (citing *Staton*, 327 F.3d at 954). Therefore, whether Allstate conducted mandatory training sessions and imparted

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

mandatory sales techniques is a common issue.

*       *       *

Of the five primary post-2007 policies on which Plaintiffs base their Motion, the allegedly mandatory training is the only significant issue susceptible to common proof. The presence of one or a few common issues is not sufficient to show that common issues predominate under Rule 23(b)(3). *Hanlon*, 150 F.3d at 1022. Rather, the Court balances the weight of the individual and common issues. *Wells Fargo*, 571 F.3d at 959. Here, there are several, substantial issues with respect to the alleged control of agencies that will require individualized evidence and analysis.5  Indeed, Plaintiffs conceded at the hearing on the Motion that the most significant issue is Allstate's alleged use of RFG to coerce agents to allocate resources in order to sell renter's and life insurance policies. For the reasons set forth above, Plaintiffs have not shown that this issue can be resolved on a classwide basis. For all of the foregoing reasons, Plaintiffs have not shown that common issues predominate in this action.

   f)  Secondary *Borello* Factors

Plaintiffs contend that the secondary indicia of an employment relationship that are set forth in *Borello* also turn on common issues of fact and law. Thus, they argue that all agents in the putative class conduct sales, can operate without specialized skills, receive the same instrumentalities and tools, perform services for a common length of time, are paid on commission, sell Allstate insurance products as part of Allstate's regular business, and believed they were entering into an independent contractor relationship. Dkt. 90, p. 21; *Borello*, 48 Cal.3d at 351. However, many of these secondary indicia describe elements of the relationship between Allstate and the putative class members that have not changed between 1996, when the Agreements were signed, and the present. Plaintiffs contend that, although the pre-2008 policies and practices did not, alone, make the agents employees, the combination of those policies and practices and those adopted after 2007 did make the agents employees. However, as Plaintiffs conceded at the hearing on the Motion, the most substantial factors are the post-2007 practices, including the allegedly coercive RFG sales targets for particular policies. Again, several of those issues cannot be answered with common evidence and analysis. Therefore, Plaintiffs have not shown that common issues predominate with respect to the most substantial factors in this action. Although there are certain common issues with respect to the secondary factors, individual issues predominate with respect to the principal test set forth in *Borello,* "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Id.* at 404.6

---

5  In the TAC, Plaintiffs refer to several other alleged policies and practices through which Allstate allegedly asserted excessive control over agents. These include increased communication between Allstate management and agents' employees, and requiring agents to use Allstate software, fax Allstate "trailing documents" on new policies, conduct "home re-inspections on non-renewals," and contact customers whom Allstate identified as shopping for insurance online. Dkt. 72, ¶ 89. However, even if it were established that each of these issues was susceptible to common proof, it would not be sufficient to outweigh the substantial individualized questions on which the claims are primarily based.

6  Defendant contends that Plaintiffs also have failed to propose a model for calculating damages attributable solely to the classwide theory of liability, as required under *Comcast Co. v. Behrend,* 133 S. Ct. 1426 (2013). Like the plaintiffs in *Comcast*, Plaintiffs here initially brought three causes of action, but seek class certification only for two of them. Dkt. 90, p. 4. Also like the plaintiffs in *Comcast,* Plaintiffs' proposed model for calculating damages does not

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV11-09206 JAK (FFMx) | Date | November 20, 2013 |
|---|---|---|---|
| Title | Juan Comparetto, et al. v. Allstate Insurance Company | | |

        2.       Rule 23(b)(3)(A)-(D): Superiority of Class Action

Because common issues do not predominate, the individual factors outlined in Rule 23(b)(3)(A)-(D), which are largely undisputed, are addressed briefly. Defendant concedes that the factors set forth in Rule 23(b)(3)(A)-(C) support a determination that a class action is a superior method for resolving the claims. However, Defendant contends that the factor set forth in Rule 23(b)(3)(D), "the difficulties likely to be encountered in the management of a class action," precludes a determination that a class action is a superior method. Thus, Defendant contends that "[b]ecause Plaintiffs' claims are driven by individual inquiries, a class action would be totally unmanageable. The Court would become mired in hundreds of mini-trials on each of the discrete issues." Dkt. 92, p. 25. Plaintiffs contend that mere difficulties in management cannot preclude class certification, particularly where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." Dkt. 90, p. 24 (citing *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)). Given that substantial individualized issues predominate in this action, a class action would not be a superior method for "fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**IV.**     **Conclusion**

For the foregoing reasons, the Motion is DENIED.

**IT IS SO ORDERED.**

|  | : |
|---|---|
| Initials of Preparer | ak |

---

attempt to isolate the loss in value caused only by the conduct underlying the claims in the causes of action for which certification is sought. Plaintiffs' damages expert, J. Michael Issa, proposed calculating damages by generating a "base-line" value for different groups of agencies, sorted by size, "using a 'factor' or 'multiple' which is multiplied by the annual commission generated by the agency in order to determine representative agency value and thus the price at which a particular agency should sell at any given time." Issa Decl., Dkt. 90-3, p. 4. Issa then proposed using the factor to "measure the increase or decrease in agency value over time," which would "allow [him] to extrapolate both the total amount of lost value of the California based R3001 agencies during the relevant time, as well as the amount each particular California based R3001 agency lost in value." *Id.* This proposed calculation would not identify the amount of lost value caused by Allstate's alleged micro-management of the agencies (as alleged in the second and third causes of action) from the amount of lost value caused by Allstate's alleged failure to approve qualified buyers (as alleged in the first cause of action). At the hearing on the Motion, Plaintiffs argued that the alleged failure to approve qualified buyers, although alleged in the first cause of action, and not referenced in the Motion, was an additional indicia of control relevant to Defendant's liability under the second cause of action. As a result, Plaintiffs argued, the damages arising under the first cause of action are also recoverable under the second cause of action. Because individualized issues predominate with respect to the analysis of liability under the second and third causes of action, and the adequacy of Plaintiffs' damages model is not dispositive of the Rule 23(b)(3) analysis, the Court does not determine whether Plaintiffs have proposed an adequate model for calculating damages. *Cf. Comcast*, 133 S. Ct. at 1430 (noting that it was uncontested that determining damages to be a common issue was necessary to satisfy Rule 23(b)(3) in that case); *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (holding, after *Comcast*, that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)").